OPINION OF THE COURT
Aileen Haas Schwartz, J.
The far-reaching issue in this case is the legal effect of the social worker-client relationship in the client-parent’s challenge to section 384 of the Social Services Law, surrender agreement: does the social worker-client relationship per se mandate application of the doctrine of constructive fraud? Does the social worker-client relationship per se constitute a major factor in a cause of action sounding in actual fraud?
The facts sub judice present a troublesome and not uncommon pattern: an agency plan for adoption by particular individuals, which plan is known to the parent at the time of execution of the surrender instrument, and a subsequent change of that plan. Petitioner Hector M. and petitioner Maria M. contend that they were fraudulently induced to execute the subject instruments regarding their two children *678 by the misrepresentation that the surrenders were for the sole purpose of adoption by the children’s then foster parents, the Torreses, and would be utilized for that purpose only.
None of the four instruments reflects such limitation. In pertinent part, each instrument provides: "I do hereby, pursuant to the provisions of Section 384 of the Social Services Law, transfer legal custody and commit the guardianship of my child to the said Commissioner of Social Services of the City of New York * * * I do hereby further voluntarily and unconditionally surrender my child to the Commissioner of Social Services of the City of New York, a duly authorized agency as defined in Article VI of the Social Services Law, for the purpose of placing her [or him] in a foster home for adoption, and hereby expressly empower and authorize said Commissioner or his designee to consent to the adoption of my said child above named with the same force and effect as though I consented myself, without further notice to me * * * I understand that, by. surrendering said child to an authorized agency, I relinquish all of my personal rights to my child.”
The Commissioner of Social Services (hereinafter CSS) and the authorized agency directly involved, the Catholic Home Bureau (hereinafter CHB), defend on the basis of the unconditional terms of the surrender instruments and their consequent contractual rights to the children. The Law Guardian supports the position of the father but not that of the mother.
The surrender instruments constituted the culmination of efforts of CHB to formulate and to implement an alternative to indefinite foster care with the attendant deleterious effects of such status upon the two children under the circumstances. Ivan M. and Maria M. had been in the custody of CSS and the care of CHB since December, 1974. Their mother had requested such aid on an emergency basis. The two children, Maria, born January 30, 1968, and Ivan, born January 12, 1969, and a younger sibling, Adam, had been in the care of their mother since their parents’ separation in the latter part of 1972. At the time of their voluntary placement and consistently thereafter, the mother avowed she was unable to fulfill the obligation of caring for Ivan and Maria. She did not visit the children (only the then foster master testified to a few visits by the mother during the entire period involved), and she expressly abdicated her parental role to the father. The father visited the children and assumed the responsibility to plan for their future care. Several plans to that end were *679 presented by the father including care by members of his family and a discharge to him upon the parents’ divorce and his marriage to his then fiancée. Each of the plans proved unrealistic: the paternal grandparents were clearly inadequate to the task and the father’s "engagement” was short-lived.
After approximately one year of assignment to the case, Mr. W. J. B. intensified CHB’s endeavors to aid in effecting a resolution of the problem of the children’s continuing foster care status. Mr. W. J. B. was the social worker for the parents, the foster parents and the children. Commencing in January, 1976, the mother informed Mr. W. J. B. of the plan she had formulated for her future. That plan expressly excluded Ivan and Maria. At best, she explained, she could care only for Adam. Her past attempts to care for all three children had resulted in failure harmful to herself and the children. No longer would she subordinate her interests to those of the children. She planned to divorce their father and to continue her schooling to achieve a high school equivalency diploma in preparation for employment as a secretary. Mrs. M. relied totally on Mr. M. to plan for Ivan and Maria.
Contemporaneously with his discussions with the mother, the social worker also met with the father to stress the need for a viable alternative to continuing foster care. As indicated above, investigation of the father’s then plans involving the paternal grandparents established their inappropriateness. Then, in April, 1976, the father’s plan to marry again disintegrated.
The social worker had already informed the parents of the agency’s legal obligation, under the circumstances, to consider legal proceedings pursuant to section 384-b of the Social Services Law toward the goal of a "permanent home” for the children through adoption. Voluntary surrender was discussed with the mother. In May, 1976, the mother again raised the subject of surrender and indicated a decision to so act.
The Torreses had cared for the children as foster párents since December, 1974. The foster parents’ relations with the father were cordial. Indeed, visitation included the Torreses’ home, and the father was made to feel welcome there. In March, 1976, Mrs. Torres expressed a wish to adopt Maria to the social worker. During surrender discussions in June, 1976, the social worker advised the mother that he would explore whether the Torreses were interested in adopting the chil *680 dren. On June 18, 1976, the Torreses decided to adopt both children. Once again on June 28, 1976, and then on July 16, 1976, the mother indicated her intention to surrender the children and expressed the view that adoption by the Torreses would be best for the children. Sharply contrasted with the mother’s intentions, the father vehemently opposed surrender of the children and vowed to "fight” in court. Then, on August 2, 1976, the father telephoned the social worker and stated that he had met with the Torreses who had assured him of their intention to adopt the children and who had promised to permit the parents to continue to visit the children after the adoption. Mrs. Torres testified to the same effect and to a like discussion with the social worker. The father told the social worker that his decision to execute the surrender instruments was based upon those two factors. The social worker discussed surrender within the context of adoption by the Torreses and solely within that context immediately prior to execution of the instruments. Mr. W. J. B. testified that it was his function to advise the parents of the import of surrender and that he did so by explaining that the Torreses would be the new parents and that the Torreses would be able to give the children new names and everything. The clear representation was that surrender was for the sole purpose of adoption by the Torreses and the instrument would be utilized for that purpose alone.
On August 5, 1976 each parent executed a separate surrender instrument for each child, a total of four instruments.
On August 10, 1976 the Torreses executed papers evidencing their intention to adopt the two children.
The father continued to visit the children with the knowledge of CHB.
Sometime in late May or early July, 1977, the Torreses decided not to adopt the children. CHB arranged a conference with the parents. Mr. M. asserted the same position as now alleged and emphasized the need to revoke the surrender instruments. Throughout periods of discussion with the CHB, he has maintained that position.
The mother did not visit the children during the period subsequent to August 5, 1976, nor did she participate in the conferences immediately following the Torreses’ decision not to adopt.
The mother did not testify at the trial.
*681 Two major questions must be addressed:
(1) Is the doctrine of constructive fraud properly invoked either based upon the social worker-client relationship per se or upon all the circumstances, including the social worker-client relationship, on an ad hoc basis?
(2) Has each petitioner sustained the burden of proving actual fraud in this proceeding for rescission?
Petitioner’s reliance upon the doctrine of constructive fraud is misplaced. The doctrine is deeply rooted in Anglo-American decisional precedents that have delineated its protective aegis with painstaking precision. (See 3 Pomeroy’s Equity Jurisprudence [5th ed], § 922 et seq.) An understanding of the doctrine, according to Professor Pomeroy, must begin with the recognition that "[t]he term 'constructive fraud’ is not a very appropriate one, but has been used so long that any attempt to substitute another in its place would be useless * * * The distinguishing element of actual fraud * * * is always untruth * * * Untruth is not the distinguishing element of constructive fraud * * * Constructive fraud is simply a term applied to a great variety of transactions, having little resemblance either in form or in nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud.” (3 Pomeroy’s Equity Jurisprudence [5th ed], pp 625-626.)
In 1878, the New York Court of Appeals characterized the law of constructive fraud as "well settled” (Cowee v Cornell, 75 NY 91, 100) and set forth the classic American statement of the concept: "It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and *682 that all was fair, open, voluntary and well understood.” (Cowee v Cornell, supra, at pp 99-100; see 3 Pomeroy’s Equity Jurisprudence [5th ed], § 922 et seq.) for a more inclusive definition of the doctrine as enunciated (p 627) "[i]n the great case of Chesterfield v. Janssen [by] * * * Lord Hardwicke”.
Manifestly, the jurisprudential underpinning of the doctrine may be traced to the strict standards of legal morality demanded of the fiduciary. Of critical significance, the doctrine is more than a statement of reaffirmation of the law’s time-honored commandments governing the fiduciary, for the doctrine prescribes the procedural remedy to vindicate those mandates. The transaction is presumed void, and the burden of proof is shifted to the fiduciary.
Paradoxically, notwithstanding the clarity of the concept, application of the doctrine proves vexing. "The law presumes in the case of guardian and ward, trustee and cestui que trust, attorney and client, and perhaps physician and patient, from the relation of the parties itself that their situation is unequal and of the character * * * defined; and that relation appearing itself throws the burden upon the trustee, guardian or attorney of showing the fairness of his dealings.” (Cowee v Cornell, supra, at p 100; see 12 Williston, Contracts [3d ed], § 1499 regarding the effect of the relationship between executor and legatee, principal and agent, partner and copartners, joint venturer and fellow joint venturers.)
Is the social worker-client relationship included within the purview of the class of fiduciary relationships that per se invoke the doctrine of constructive fraud and thus throw "the burden upon the [social worker] of showing the fairness of his dealings”? (Cowee v Cornell, supra, at p 100.)
Petitioners’ argument that the doctrine applies to the social worker-client relation can hardly be viewed as intellectual exoticism. Experienced lawyers know that the decision of burden of proof may well determine which party will prevail in litigation.
New York has afforded statutory status to the special nature of the social worker-client relationship. (CPLR 4508; but cf. Family Ct Act, § 1046; Social Services Law, § 384-b.) Moreover, it cannot be seriously controverted that essential attributes of the relationship include confidentiality, trust and reliance. Clearly, the social worker, attorney, trustee and guardian alike must serve the interests of the other party to the relationship. Nevertheless the very nature of the trust *683 reposed in the attorney, trustee and guardian, is sui generis: the distinguishing hallmark lies in the authority and responsibility to act in the place and stead of the client, cestui que trust and ward respectively. Juxtaposed with the attorney-client, trustee-cestui que trust and guardian-ward relationships, the character of the social worker-client relationship does not warrant a per se presumption of an "unequal situation” in the context of the doctrine of constructive fraud.
Nor does the circumstance of the character of the surrender instrument as an agreement between the State and the parent ipso facto render the transaction one within the ambit of the doctrine. The singular nature of the social worker-parent relationship in a foster care context reflects the State’s obligation to the family and the State’s transcendent responsibility for the child. The preamble to section 384-b of the Social Services Law provides: "[T]he state’s first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; and * * * when it is clear that the natural parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.” (Social Services Law, § 384-b, subd 1, par [a], els [iii], [iv].) As embodied further in section 384 of the Social Services Law public policy accords primacy to the child who is the subject of the surrender, and a rule that deems such transaction presumptively void would militate against the very purpose of ensuring stability in the life of that child.
That does not mean that the doctrine may not be deemed applicable to a social worker-client relationship, even in the context of a surrender agreement, on an ad hoc basis upon evidence establishing probable unfairness. (See, e.g., Matter of Gordon v Bialystoker Center & Bikur Cholim, 45 NY2d 692; see, also, Parker v Parker, 66 AD2d 328, applying the doctrine to a "stipulation of settlement” between husband and wife under the factual circumstances.)
The evidence in the instant matter was to the contrary. Had there been a happy ending to the plan for adoption of Ivan and Maria by the Torreses, none would gainsay that the plan and its implementation were attributable to a dedicated social worker, Mr. W. J. B. No evidence contradicted the portrait of a social worker sensitive to the needs of each of the parents and the children, including Adam. Nor has either parent chai *684 lenged the manner in which the social worker fulfilled his obligations to each of the parties involved with the exception of the alleged misrepresentation. The parents, for their part, questioned and discussed the subject of surrender, and the father independently evaluated adoption by the Torreses. It is not denied that both parents are intelligent and literate, and that neither was incapacitated in any pertinent way during the period involved. Hence, petitioners failed to demonstrate that the CSS or the CHB should be subject to the burden cast upon the "fiduciary” by the doctrine of constructive fraud.
By contrast, suffice it to say that the social worker-client relationship should be considered as a factor in a cause of action predicated upon allegations of fraudulent inducement within the context of a surrender instrument.
Mr. W. J. B. testified that he was the social worker assigned to each of the estranged parents and to the children. He also counseled the Torreses in their role as foster parents to Ivan and Maria and another unrelated child and in their expressed wish to adopt a child. Additionally, as witness for the respondents CSS and CHB, Mr. W. J. B. testified that he alone had the authority and responsibility to explain the import of surrender to the parents. CHB adduced testimony from the only other representative involved in the execution of the instruments, the member of the legal department, who was responsible for preparation of the documents and who served as notary in their execution. That witness testified that he did not discuss the instruments with parents. Mr. W. J. B. was present at the execution of the documents and he alone dealt with the parents even at that stage. Neither the commissioner nor CHB challenged any aspect of Mr. W. J. B.’s claimed authority in the matter.
The subject executed surrender instruments are printed form agreements devised and utilized by the CSS. (See, in this regard, Social Services Law, § 384; Matter of Janet G. v New York Foundling Hosp., 94 Misc 2d 133.) Section 384 of the Social Services Law prescribes the use of a surrender instrument and states, inter alla, "Such guardianship shall be in accordance with the provisions of this article and the instrument shall be upon such terms and subject to such conditions as may be agreed upon by the parties thereto.” (Social Services Law, § 384, subd 2.) In pertinent part, as indicated above, the terms of the document provide for an unconditional surrender for the purpose of adoption.
*685 Hornbook law would appear to preclude judicial inquiry further than examination of the documents under the circumstances. "Ordinarily, the signer of a deed or other instrument, expressive of a jurai act, is conclusively bound thereby. That his mind never gave assent to the terms expressed is not material. (Wigmore on Evidence, § 2415.) If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him.” (Pimpinello v Swift & Co., 253 NY 159, 162-163.)
To turn again to Cowee v Cornell (75 NY 99) "It may be stated as universally true that fraud vitiates all contracts”.
Without meaning to detract from the legal-maxim status of the above statement, it appears clear that, in truth, not all allegations sounding in fraud are universally cognizable.
New York has long been in the vanguard of jurisdictions that have adopted an expansive concept of actionable fraud. That view reflects a strong public policy commitment to deter deceit and artifice in contractual transactions. Other jurisdictions have emphasized the value of certainty in contractual obligations and have formulated a more restrictive definition of actionable fraud.
The divergence of views is most pronounced regarding the legal effect of "antecedent fraud.” Some jurisdictions deny redress for deception extrinsic to the four corners of the writing. New York early repudiated that narrow approach. Well could a New York court declare, "In this jurisdiction protection is given to one who is injured by falsehood or deception; fraud vitiates everything which it touches, and destroys the very thing which it was devised to support; the law does not temporize with trickery or duplicity. A contract, the making of which was induced by deceitful methods or crafty device, is nothing more than a scrap of paper, and it makes no difference whether the fraud goes to the factum, or whether it is preliminary to the execution of the agreement itself.” (Angerosa v White Co., 248 App Div 425, 431, affd 275 NY 524, cited with favor in Sabo v Delman, 3 NY2d 155, 161; see, also, Millerton Agway Co-op. v Briarcliff Farms, 17 NY2d 57.)
New York courts are vigilant in their scrutiny of fraud not only to protect the interests of the individual aggrieved but also to vindicate the law’s integrity by eschewing even the *686 slightest semblance of judicial imprimatur for a transaction tainted by deception.
Consistent with that commitment, New York law does not countenance impediments to evidence of fraud. "The paroi evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument and, accordingly, one who seeks, in a breach of contract action, to enforce an oral representation or promise relating to the subject matter of the contract cannot succeed * * * However, the paroi evidence rule has no application in a suit brought to rescind a contract on the ground of fraud. In such a case, it is clear, evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement.” (Saba v Delman, 3 NY2d 155, 161, supra.)
Upon like reasoning, New York law has rejected the argument that a written provision of disclaimer as to representations not incorporated in the written agreement, sometimes called a merger clause, forecloses evidence of "antecedent fraud.” As the Court of Appeals declared in Bridger v Goldsmith (143 NY 424, 428): "[TJhere is no authority that we are required to follow in support of the proposition that a party who has perpetrated a fraud upon his neighbor may, nevertheless, contract with him in the very instrument by means of which it was perpetrated, for immunity against its consequences, close his mouth from complaining of it and bind him never to seek redress. Public policy and morality are both ignored if such an agreement can be given effect in a court of justice. The maxim that fraud vitiates every transaction would no longer be the rule but the exception.” (See Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77, 86; Crowell-Collier Pub. Co. v Josefowitz, 5 NY2d 998; Sabo v Delman, 3 NY2d 155, 161, supra; but cf. Danann Realty Corp. v Harris, 5 NY2d 317, 320-321.) Logic dictates that the same effect be afforded the provision in section 384 of the Social Services Law that prescribes a "written instrument”. "Even the statute of frauds”, Professor Pomeroy instructs, "cannot, by shutting out paroi evidence, be converted into an instrument of fraud or wrong.” (3 Pomeroy’s Equity Jurisprudence [5th ed], p 351; see Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403, 408; Brandwein v Provident Mut. Life Ins. Co. of Phila., 3 NY2d 491, 496.)
Based upon the same philosophy, whatever the earlier *687 conflicting views, New York law repudiated the "fact”-"promise” test as a sophistic dichotomy. Adams v Gillig (199 NY 314) is the oft-cited case in which the Court of Appeals in an opinion per Chase, J., demonstrated the logical deficiencies of the fact-promise rule in its absolutist form. The starting point for the reasoning in Adams v Gillig (supra, at p 319) is established law: "Any statement of an existing fact material to the person to whom it is made that is false and known by the person making it to be false and which is made to induce the execution of a contract, and which does induce the contract, constitutes a fraud that will sustain an action to avoid the contract if the person making it is injured thereby.” In Adams v Gillig (supra, at p 319) the trial court had found "that the defendant purposely, intentionally and falsely stated to the plaintiff that he desired to purchase a portion of her vacant lot for the purpose of building a dwelling or dwellings thereon.” The evidence sustained the further finding that "During all the time that the defendant was negotiating for the purchase of the lot in question he intended to build a public automobile garage thereon, which fact was unknown to the plaintiff and which the defendant fraudulently concealed from her.” (Adams v Gillig, 199 NY, at p 316.) Adams v Gillig presents a comprehensive evaluation of the law of fraud, and the language of the opinion is oft-quoted. The real contribution of Adams v Gillig (supra, p 321) lies in a most awkward sentence: "The intent of Gillig was a material existing fact in this case, and the plaintiff’s reliance upon such fact induced her to enter into a contract that she would not otherwise have entered into.” (Emphasis added.)
The import of Adams v Gillig (supra) in New York law is clear: "While 'Mere promissory statements as to what will be done in the future are not actionable’ (Adams v. Clark, 239 N. Y. 403, 410), it is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of 'a material existing fact’ upon which an action for rescission may be predicated.” (Sabo v Delman, 3 NY2d 155, 160, supra.)
Judicial formulation of the essential elements of a cause of action in fraud predicated upon "intention” as the "material existing fact” reflects the singular nature of the "fact”. Such requisite constituents are fixed as " 'representation, falsity, scienter, deception and injury’ ”. (Sabo v Delman, 3 NY2d, at p 159, citing Ochs v Woods, 221 NY 335, 338; see as to *688 innocent misrepresentation of a fact other than "intention,” 12 Williston, Contracts [3d ed], §§ 1500, 1501.)
Lest New York law appear unfairly tilted in favor of one who challenges his contractual obligation upon an allegation of fraud, attention must be drawn to the burden of proof demanded to sustain an action in fraud. New York public policy brands fraud as odious because fraud strikes at the very purpose of law in a civilized society. Yet, the courts have not been unmindful of the danger of "dishonesty and false swearing, induced, perhaps, by a change of purpose or a failure to obtain the result that was anticipated when the transaction was originally consummated” (Adams v Gillig, 199 NY, at p 318).
Adams v Gillig (supra, p 323) itself voiced the caveat:
"[i]t is not the intention of the court to extend the effect of this decision by implication, or to a case other than one where the facts are clearly found against the defendant.
"The courts will be vigilant to prevent the rescission for fraud of a contract deliberately made unless the fraud is admitted or proven by most satisfactory evidence.”
In the aftermath of Adams v Gillig (supra) not all subscribed to the view that a burden more demanding than the preponderance standard traditionally prescribed in civil proceedings was appropriate. The better view would require a clear and convincing or comparable standard of proof. Fraud is a serious charge even in the context of a civil proceeding. "In this regard, a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.” (Matter of Winship, 397 US 358, 370, Harlan, J., concurring opn.) Standard of proof thus reflects a societal value regarding risk of error in fact finding. (See Matter of Winship, supra, p 358, for discussion of the societal precepts underlying the determination of the proper evidentiary standard even in a matter unaffected by constitutional considerations.) In Rudman v Cowles Communications (30 NY2d 1, 10) in express reliance upon Adams v Gillig (199 NY 314, 323, supra) the Court of Appeals declared, "fraud must be made out by 'satisfactory’ or 'clear and convincing’ evidence”.
Viewed as a multidimensional concept in which strict procedural standards complement an expensive substantive ap *689 proach, the New York law of fraud achieves a just equilibrium between the competing interests at stake.
To turn to application of that law to the case under consideration.
Petitioner father has sustained the burden of proving clearly and convincingly each of the elements of representation, falsity, scienter, deception and injury. Petitioner mother has not met her burden.
Initially, it is noted that the characterizations of "trickery,” "duplicity,” or "rogue” (Ernst Iron Works v Duralith Corp., 270 NY 165, 169; Angerosa v White Co., 248 App Div 425, supra) seem ill suited to the individual and motives involved herein. Neither the dedication nor the lofty goal of the social worker, however, affects the legal import of his deeds.
The evidence established clearly and convincingly that the social worker represented to the father and the mother in July and August that the surrender instruments were for the sole purpose of adoption by the Torreses and would be utilized for that adoption only. Earlier discussions with the mother had not so limited the surrenders. According to his own testimony, the social worker did not view the surrender instruments in such limited manner at the time of the representations to the parents, and he knew at that time that the surrender instruments would not be so limited by the Commissioner of Social Services or the Catholic Home Bureau. The social worker also knew that the father would not have executed the surrender instruments under any other circumstances. Under all the circumstances, including the social worker-client relationship factor, the father was justified in trusting and relying upon the social worker. The father was deceived. Injury? Surrender of the children. As noted above, neither the CSS nor the CHB challenged any aspects of the claimed authority of the social worker. In this regard, it is noted in passing, that such challenge would have been of no avail in light of the unmistakable apparent, even if not real, authority to so act. (See Wen Kroy Realty Co. v Public Nat. Bank & Trust Co., 260 NY 84, 91.) Further, the law is clear that the principal may not retain the benefits of an agreement and repudiate "the instrumentalities by which the contract was consummated.” (Angerosa v White Co., 248 App Div 425, 433, affd 275 NY 524, supra, and cases cited thereat.)
In contrasting the proof by the mother and that by the father, it is noted that the mother had discussed surrender *690 even without the condition of adoption by the Torreses. To her, adoption by the Torreses made surrender of her parental rights more easily acceptable. She had abdicated the parental role, even refusing to see the children for an extended period of time as set forth above. Significantly, the mother did not testify. (See Richardson, Evidence [10th ed], § 92.)
" 'A conclusive test of misrepresentations being the inducement to the contract is the fact (if it be so) that the party would have refused his consent if the representations had not been made or if he had known the truth.’ ” (Jones v Title Guar. & Trust Co., 277 NY 415, 419.)
Clearly, this was the case with regard to the father, and the social worker knew it. The evidence as to the mother was fatally deficient in this respect.
The petition of the father is granted, and the surrender instruments executed by him are set aside as null and void. The mother’s petition is dismissed.