**Christine SCHMIDT, Plaintiff,**

v.

**Joseph P. BISHOP, Rye Presbyterian Church, Presbytery of Hudson River, Presbyterian Church (USA), Defendants.**

**No. 91 Civ. 4125 (CLB).**

United States District Court, S.D. New York.

Dec. 6, 1991.

Jeffrey R. Anderson, Reinhart & Anderson, St. Paul, Minn., for Christine Schmidt.

Barry Strutt, Keegan, Keegan & Associates, White Plains, N.Y., for Joseph P. Bishop.

Henry Weisburg, Shearman & Sterling, New York City, for Rye Presbyterian Church.

Lawrence T. D'Aloise, Jr., Clark, Gagliardi & Miller, White Plains, N.Y., for Presbytery of Hudson River.

Mark Seisel, David E. Worby, P.C., White Plains, N.Y., for Presbyterian Church (USA).

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

In this diversity case controlled by New York law, defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), on various grounds. Because affidavits and other information were received and considered, the Court on October 9, 1991 converted the motion into a motion for summary judgment pursuant to Fed. R.Civ.P. 56, and opened the record to further submissions from the parties.

The complaint pleads four separate claims against the individual defendant, Joseph P. Bishop, framed as claims for negligence (count I), malpractice (count II), breach of fiduciary duty (count III) and fraud (count IV).

The complaint also charges the remaining defendants (the "Church Defendants") with (Count V) responsibility for the wrongful conduct of Bishop under the doctrine of *respondeat superior*, with (Count VI) negligent placement, retention or supervision of Bishop and (Count VII) with simple negligence.

## FACTUAL BACKGROUND

Our analysis must be based on the facts well pleaded as amplified by the affidavits, without regard to the legal theories or labels attached by the pleader. The facts, denied by defendants, but assumed to be true for purposes of the motion, are found

in the plaintiff's complaint and in her affidavit docketed October 1, 1991.

Ms. Schmidt was born in 1948 and became a member of the Rye Presbyterian Church in 1957. Complaint at ¶¶ 8–9. Three years later, when she was twelve years old, her parents brought her to the defendant Bishop for "emotional, spiritual and familial counseling". Schmidt Affidavit at ¶ 2. At that time Rev. Bishop was the pastor of the Rye Presbyterian Church. Thereafter, Schmidt alleges, she became emotionally dependent on Bishop, since he gave her the "emotional support and guidance" which she believed she needed. Schmidt Affidavit at ¶ 3.

Shortly after the counseling relationship began, she asserts that Joseph Bishop initiated "sexual contact". The contact, described in some detail, did not involve rape or sexual intercourse, but essentially reflects the crime of sexual abuse in the second degree, in violation of New York Penal Law § 130.60 as presently in effect. This statute, adopted as part of a comprehensive revision by the legislature in 1965, was derived from former §§ 483–a and 483–b of the Penal Law of 1909.

According to Ms. Schmidt's affidavit, Bishop invoked God as supporting the conduct in which he allegedly engaged, and informed her that "the relationship was special and acceptable in the eyes of the Lord" and that "it was not something [she could] share with others...." Schmidt Affidavit at ¶ 5. Although plaintiff left Rye in 1977, the counseling relationship between plaintiff and defendant Bishop continued until June 17, 1989, because plaintiff "continued to believe that the relationship with Joseph Bishop was a special relationship and that there was nothing wrong with it...." Schmidt Affidavit at ¶ 6.

The reason that the relationship was ultimately terminated was that Ms. Schmidt had entered psychotherapy in January 1988. According to her affidavit, it was in the fall of 1989 that, as a result of her therapy, she "began to understand that the contact with Joseph Bishop was wrong, that he sexually abused me and that I suffered severe damage as a result of that abuse." Schmidt Affidavit at ¶ 6.

The nature of the relationship between Ms. Schmidt and defendant Bishop, as well as her failure to perceive the wrongfulness of Bishop's actions until she was forty-one years old, is addressed in the affidavit of Dorothy Miller. Ms. Miller, a licensed clinical social worker and Ms. Schmidt's primary treating therapist, avers that Ms. Schmidt "believed [Bishop] to be her sole confidant", that she therefore "was incapable of pulling away from Joseph Bishop" and "was necessarily forced to succumb to Joseph Bishop's wishes." Miller Affidavit at ¶¶ 5–6.

Ms. Schmidt filed this action on June 17, 1991, and defendant Bishop answered the complaint on July 17, 1991.

*Analysis of the Complaint against Bishop*

The facts alleged in this complaint support clearly an action for a battery or some similar intentional tort, for which the statute of limitations is one year, N.Y.Civ. Prac.L. & R. § 215(3) (McKinney 1990); it is equally clear that had the plaintiff or her family notified the authorities in a timely fashion—specifically, within two years of the initial incident—the defendant Bishop might well have been prosecuted for criminal sexual abuse. N.Y.Penal Law § 130.60 (McKinney 1987); N.Y.Crim.Proc.Law § 30.10(2)(c) (McKinney 1981).

Count I of the complaint, however, pleads a negligence claim against defendant Bishop, alleging specifically that he breached a duty owed her by entering into the relationship at all, knowing of his propensities, and that he breached that duty further by engaging in sexual exploitation of her and failing to reveal the wrongful nature of that conduct. Complaint at ¶ 20.

Even if the Court were to invite a trial jury to engage in the Constitutionally dubious task of setting a standard of reasonable care for clergymen engaged in counseling, the obstacle remains that New York courts have rejected uniformly such attempts to transmogrify intentional torts into "negligence". *See, e.g., Rafferty v.*

*Arnot Ogden Memorial Hospital,* 140 A.D.2d 911, 913, 528 N.Y.S.2d 729, 730 (3d Dep't 1988) (rejecting claim of negligent assault in sexual molestation case); *Mazzaferro v. Albany Motel Enterprises, Inc.,* 127 A.D.2d 374, 375, 515 N.Y.S.2d 631, 632 (3d Dep't 1987) ("New York has adopted the prevailing modern view that, once intentional offensive contact has been established, the actor is liable for assault and not negligence ..."); *Trott v. Merit Department Store,* 106 A.D.2d 158, 160, 484 N.Y.S.2d 827, 829 (1st Dep't 1985) (same). It is thus legally impossible to claim that the alleged perpetrator of deliberate sexual abuse injured the plaintiff negligently.

■ Similarly, to the extent that the plaintiff's negligence claim is founded on Bishop's mishandling of the counseling relationship generally, that claim is properly treated as one for malpractice, *see infra* at 326–328. This particular aspect of defendant's conduct involves a purported breach of *professional* standards by an ordained minister, and as such is cognizable only as a malpractice claim. *Papa v. Brunswick General Hospital,* 132 A.D.2d 601, 517 N.Y.S.2d 762 (2d Dep't 1987) (discussing distinctions between simple negligence and malpractice actions against physicians).

Count III of the complaint charges Bishop with a breach of fiduciary duty. In perhaps the most widely quoted and far-reaching New York case on the definition of a "fiduciary" relationship, the court held:

> "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.... Such a relationship might be found to exist, in appropriate circumstances, between close friends ... or even where confidence is based on prior business dealings...."

*Penato v. George,* 52 A.D.2d 939, 942, 383 N.Y.S.2d 900, 902 (2d Dep't 1976), *appeal dismissed,* 42 N.Y.2d 908, 366 N.E.2d 1358, 397 N.Y.S.2d 1004 (1977). *See also* Restatement (Second) of Torts § 874 comment a.

■ Despite this expansive characterization of the term, it is clear that not every confidential relationship or joint venture involves as a "fiduciary" relationship. *See, e.g., Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 769 (S.D.N.Y.1990) (generally no fiduciary relationship between boxer and promoter); *Kirkland v. American Title Insurance Co.,* 692 F.Supp. 153, 157 (E.D.N.Y.1988) (no fiduciary relationship between property owners and title insurance company); *Sobol v. E.P. Dutton, Inc.,* 112 F.R.D. 99, 104 (S.D.N.Y.1986) (Weinfeld, J.) (no fiduciary relationship between author and publisher).

■ On the other hand, although the term generally implies the existence of a professional or commercial relationship,[1] the term as defined in New York also comprehends "informal relations". *Compare MacDonald v. Clinger,* 84 A.D.2d 482, 446 N.Y.S.2d 801 (4th Dep't 1982) (psychiatrist owed patient fiduciary duty) *with DiMaio v. State,* 135 Misc.2d 1021, 517 N.Y.S.2d 675 (Ct.Cl.1987) (State Division of Veterans Affairs counselor owed no fiduciary duty to Vietnam veteran being counseled) *and Hector M. v. Commissioner of Social Services,* 102 Misc.2d 676, 425 N.Y.S.2d 199 (Fam. Ct.1980) (social worker owed no fiduciary duty to client on facts presented).

■ Irrespective of whether the pastoral relationship may generally be characterized as a "fiduciary" relationship, the Court is persuaded that defendant Bishop should prevail on this count. First, the duty allegedly violated by the defendant was not so much a special "fiduciary" duty, which may

---

1. Such an assumption would also seem to inhere in then Judge Cardozo's famous holding that a fiduciary "is held to something stricter than the morals of the marketplace. Not hones-

ty alone, but the punctilio of an honor the most sensitive, is the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

be imposed on an individual as a matter of social policy, *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 55, 529 N.Y.S.2d 279, 282 (1st Dep't 1988), but rather the general duty to refrain from violating the penal laws.

Second, in analyzing and defining the scope of a fiduciary duty owed persons by their clergy, the Court would be confronted by the same constitutional difficulties encountered in articulating the generalized standard of care for a clergyman required by the law of negligence. *See infra* at pp. 326 *et seq.* Third, as with her negligence claim, Ms. Schmidt's fiduciary duty claim is merely another way of alleging that the defendant grossly abused his pastoral role, that is, that he engaged in *malpractice*. *MacDonald, supra,* 446 N.Y.S.2d at 805–06 (Simons, J., concurring) (plaintiff's claim of unauthorized disclosure of confidences by psychiatrist was claim for malpractice rather than for breach of fiduciary duty).

■ Plaintiff's fourth claim is for fraud. To state a claim for fraud in New York, a plaintiff must allege:

"(1) that the defendant made a misrepresentation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury."

*Computerized Radiological Services v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir.1986) (quoting *Brown v. Lockwood,* 76 A.D.2d 721, 730, 432 N.Y.S.2d 186, 193 (2d Dep't 1980)). In analyzing fraud claims under New York law, courts are instructed to examine closely the sufficiency of plaintiff's complaint, since the statute of limitations for fraud is significantly longer than for other civil claims. *Von Bulow ex rel. Auersperg v. Von Bulow,* 657 F.Supp. 1134, 1140 (S.D.N.Y.1987).

■ Even assuming that the plaintiff has pleaded fraud with the requisite particularity, her claim under this count suffers from deficiencies similar to those of her fiduciary duty claim. A claim for fraud most often contemplates both a commercial relationship and a *pecuniary* loss flowing from a misrepresentation made in the course of that relationship. *E.g., Stich v. Oakdale Dental Center, P.C.,* 120 A.D.2d 794, 795, 501 N.Y.S.2d 529, 531 (3d Dep't 1986) ("actual pecuniary injury" was "sole compensable form of damages in a fraud action") (citations omitted). Furthermore, the injury plaintiff has suffered in this case flows not so much from Bishop's misrepresentation that their "relationship was special and acceptable in the eyes of the Lord", Schmidt Affidavit at ¶ 5, as from the independently tortious, indeed criminal, sexual abuse allegedly perpetrated by the defendant. It should also be noted that where, as here, there is also a claim of malpractice:

"It is only when the alleged fraud occurs separately from and subsequent to the malpractice that a plaintiff is entitled to allege and prove a a cause of action for intentional tort ... and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice."

*Spinosa v. Weinstein,* 168 A.D.2d 32, 42, 571 N.Y.S.2d 747, 753 (2d Dep't 1991) (quoting *Coopersmith, infra* ). *See also Bassile v. Covenant House,* — Misc.2d ——, 575 N.Y.S.2d 233 (Sup.Ct.) (dismissing fraud claim of plaintiff who had allegedly been sexually abused by defendant priest); *Coopersmith v. Gold,* 172 A.D.2d 982, 983, 568 N.Y.S.2d 250, 252 (3d Dep't 1991) (dismissing fraud claim of plaintiff who allegedly had sexual relations with defendant psychiatrist during counseling relationship). Plaintiff's fraud claim, therefore, also fails.

Count II of the complaint charges "malpractice". Plaintiff has deliberately avoided asserting that the case involves *clergy* malpractice, but rather styles this claim artfully as one for malpractice by a "youth worker and counselor". Complaint at ¶ 23. By this standard, a medical malpractice action against a surgeon might well be characterized as one for "counseling malpractice", since surgeons often engage in pre- and post-operative "counseling". It is a fact conceded in the complaint that plain-

tiff's parents brought her to defendant Bishop because he was their clergyman. That the complaint is founded on this relationship is confirmed by the pleading of a *respondeat superior* claim against the Rye Presbyterian Church, of which Rev. Bishop was then pastor. *Respondeat superior* is founded on agency, and the agency relationship, if there were any, was that of pastor, or clergy.

The Court must address the real issue here—clergy malpractice—rather than plaintiff's rather fanciful characterization of the claim as "counseling malpractice". Whether an independant tort denominated "clergy malpractice" exists has become a frequently litigated issue in the courts of this Nation. *See, e.g., Byrd v. Faber,* 57 Ohio St.3d 56, 565 N.E.2d 584 (1991); *Nally v. Grace Community Church of the Valley,* 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989); *Destefano v. Grabrian,* 763 P.2d 275 (Colo. 1988) (en banc); *Hester v. Barnett,* 723 S.W.2d 544 (Mo.App.1987). The issue has generated a growing body of scholarly commentary. *See, e.g., Nally v. Grace Community Church of the Valley: Clergy Malpractice—A Threat to Both Liberty and Life,* 11 Pace L.Rev. 137 (1990); *Clergy Malpractice: Should Pennsylvania Recognize a Cause of Action for Improper Counseling by a Clergyman?* 192 Dick.L.Rev. 223 (1987); Ericsson, *Clergyman Malpractice: Ramifications of a New Theory,* 16 Val.U.L.Rev. 163 (1981).

Although the Court has reviewed these authorities, this Court must respect and apply the law of New York as it exists now. And the fact is that neither the legislature nor the courts of New York have upheld or authorized a claim for clergy malpractice. *New York Public Interest Research Group v. The Insurance Information Institute,* 140 Misc.2d 920, 927, 531 N.Y.S.2d 1002, 1007 (Sup.Ct.N.Y.County 1988) ("Petitioners contend, and defendants do not dispute that, in fact, no member of the clergy has ever been held liable for clerical malpractice"), *aff'd,* 161 A.D.2d 204, 554 N.Y.S.2d 590 (1st Dep't 1990). Nor is this likely in New York.

Defendants concede, as they must, that tort claims can be maintained against clergy, for such behavior as negligent operation of the Sunday School van, and other misconduct not within the purview of the First Amendment, because unrelated to the religious efforts of a cleric. *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Claims of malpractice stand on a different footing. While the clergy of most denominations do provide counseling to youths and other members of their congregations, when they do so it is normally part of their religious activities; in so doing, they do not thereby become subject to the same standards of liability for professional malpractice which would apply, for example, to a state-licensed psychiatrist or a social worker, *Coopersmith v. Gold,* 172 A.D.2d 982, 568 N.Y.S.2d 250 (3d Dep't 1991). That there is no recorded instance of a New York court upholding an action for clergy malpractice, in this most litigious of states, speaks to this point, and loudly.

It would be impossible for a court or jury to adjudicate a typical case of clergy malpractice, without first ascertaining whether the cleric, in this case a Presbyterian pastor, performed within the level of expertise expected of a similar professional (the hypothetical "reasonably prudent Presbyterian pastor"), following his calling, or practicing his profession within the community. *See* Restatement (Second) of Torts § 299A. As the California Supreme Court has held in *Nally v. Grace Community Church of the Valley:*

> "Because of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional to impose a duty of care on pastoral counselors. Such a duty would necessarily be intertwined with the religious philosophy of a particular denomination or ecclesiastical teachings of the religious entity."

*Nally,* 253 Cal.Rptr. at 109, 763 P.2d at 960.

This Court agrees with *Nally,* and regards the unconstitutionality as more than possible. It is real. The Supreme Court, in the much maligned case of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), forbade the state to "foster excessive government entanglement with religion", *Id.* at 614–15, 91 S.Ct. at 2112, as violative of the First Amendment. This is the so-called "third prong" of *Lemon,* which does not appear to be the subject of apparent reconsideration by the Supreme Court in *Weisman v. Lee,* 908 F.2d 1090 (1st Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991), argued November 6, 1991, and awaiting decision. Any effort by this Court to instruct the trial jury as to the duty of care which a clergyman should exercise, would of necessity require the Court or jury to define and express the standard of care to be followed by other reasonable Presbyterian clergy of the community. This in turn would require the Court and the jury to consider the fundamental perspective and approach to counseling inherent in the beliefs and practices of that denomination. This is as unconstitutional as it is impossible. It fosters excessive entanglement with religion.

It may be argued that it requires no excessive entanglement with religion to decide that reasonably prudent clergy of any sect do not molest children. The difficulty is that this Court, and the New York courts whose authority we exercise here, must consider not only this case, but the next case to follow, and the ones after that, before we embrace the newly invented tort of clergy malpractice. This places us clearly on the slippery slope and is an unnecessary venture, since existing laws against battery, and the criminal statute against sexual abuse if timely invoked, provide adequate protection for society's interests. Where could we stop? Assume a severely depressed person consults a storefront preacher, unaffiliated with any of the mainstream denominations, but with them, equally protected by the First Amendment.

The cleric consults with our hypothetical citizen, reminds him of his slothful life, and that he is a miserable sinner; recommends prayer and fasting and warns of the Day of Judgment. Our depressed person becomes more so, and kills himself and a few more people. These deaths are followed by lawsuits. As to a licensed psychiatrist or social worker, our lay courts should have no trouble adjudicating a claim of professional malpractice on these facts. As to a clergyman, it would be both impossible and unconstitutional to attempt to do so. *See Destefano v. Grabrian,* 763 P.2d 275 (Colo. 1988) (en banc) (dismissing "negligent marital counseling" count in action against defendant priest).

Since the malpractice alleged in support of count II is the malpractice of a clergyman and not actionable in New York, the defendants are entitled to summary judgment in their favor on that count.

## The Statute of Limitations

Since the conduct alleged against Bishop is obviously actionable as an intentional tort, our reader may wonder why the pleading has been cast in the forms described. The answer is simple. The intentional tort claims are clearly time barred. Even assuming that a battery occurred at plaintiff's last encounter with defendant Bishop on June 17, 1989,[2] the statute of limitations has long since run. The same is true, of course, with respect to any battery claims that might have been based on the earlier incidents alleged, as plaintiff's toll for infancy expired in 1972.

Even as actually framed, the complaint is vulnerable to a statute of limitations defense. For example, the limitations period for negligence and most professional malpractice claims in New York is three years, or less for physicians, with the cause of action ordinarily accruing at the time of the injury. Although, the breach of fiduciary duty claim is possibly subject to a longer limitations period, *Frank Management, Inc. v. Weber,* 145 Misc.2d 995, 997–1000,

---

**2.** At the oral argument of this motion, plaintiff's counsel elliptically described this encounter as

involving "an attempted seduction".

549 N.Y.S.2d 317, 319–321 (Sup.Ct.N.Y.County 1989), it is readily apparent that such claims, too, would ordinarily be time-barred on the facts of this case.

Plaintiff, recognizing that even as pleaded, her claims are subject to a statute of limitations defense, argues both that a different accrual rule should be used in this class of cases, and that various equitable doctrines should be applied to toll the statute.

*Delayed Discovery*

■ Plaintiff first urges the Court to apply the "delayed discovery" doctrine, which essentially provides that a claim accrues only when the "plaintiff knows or should have known of the injury and the defendant's role in causing that injury." [3] Plaintiff's Memorandum at 330. Although New York courts have adhered fairly strictly to traditional accrual rules, *see infra* at 329, the legislature has on occasion enacted "discovery" rules with respect to certain specific tort claims. *See, e.g.,* N.Y.Civ.Prac.L. & R. § 214–c (McKinney 1987) (toxic tort cases). The rationale for such enactments is that it is unfair to deny a day in court to persons who, due to the lengthy latent period of their injuries, may be unaware of those injuries until long after the limitations period has expired. *Enright v. Eli Lilly & Co.,* 77 N.Y.2d 377, 382–383, 570 N.E.2d 198, 200–201, 568 N.Y.S.2d 550, 552–53 (1991); *Johnson v. Johnson,* 701 F.Supp. 1363, 1368 (N.D.Ill. 1988) (quoting *Lincoln–Way Community v. Village of Frankfort,* 51 Ill.App.3d 602, 606, 9 Ill.Dec. 884, 889, 367 N.E.2d 318, 323 (3d Dist.1977)).

It is precisely this concern that has led some courts and legislatures to adopt a discovery rule in child sex abuse cases. *See, e.g., Simmons v. United States,* 805 F.2d 1363 (9th Cir.1986); *Osland v. Osland,* 442 N.W.2d 907 (N.D.1989). *See also* Cal.Civ.Proc.Code § 340.1[a] (West 1989);

Wash.Rev.Code § 4.16. (1988). The argument for a discovery rule in this context, simply stated, is that victims of child sexual abuse often do not realize until years later either that they have been abused at all or the scope of their injuries. *Johnson,* 701 F.Supp. at 1369–70.

Persuasive though this argument may be, there is no authority for the adoption of such a rule in child sex abuse cases in New York. As a leading commentator has stated:

> "... the New York Court of Appeals has steadfastly declined to alter the traditional New York rule that the statute of limitations commences to run when the cause of action accrues, even though the plaintiff is unaware that he has a cause of action."

N.Y.Civ.Prac.L. & R. § 203 Practice Commentary at 140 (McKinney 1987). *See also Rizk v. Cohen,* 73 N.Y.2d 98, 104 n. 3, 535 N.E.2d 282, 285 n. 3, 538 N.Y.S.2d 229, 232 n. 3 (1989) ("... this court has consistently refused to judicially adopt the so-called 'discovery' rule ...").

In *Bassile v. Covenant House,* —— Misc.2d ——, 575 N.Y.S.2d 233 (Sup.Ct.N.Y.County), a case which also involved the alleged sexual abuse of a minor by a member of the clergy, Justice Baer conducted a thorough review of the policies underlying the statute of limitations, as well as the reluctance of New York courts towards varying its literal terms. *Id.* Although sensitive to the obstacles to filing a timely complaint in child sex abuse cases, he concluded that there was no discovery rule in this class of cases, and also observed aptly that "... where the courts of this state, especially the highest, have declared with consistency what the law is, it is not the province of the trial judge to opt for something different." *Id. Cf.* N.Y.Civ. Prac.L. & R. § 201 (McKinney 1987) ("No court shall extend the time limited by law

---

**3.** As noted above, plaintiff has sought to take advantage of the lengthy statute of limitations for fraud, arguing that since she only discovered the wrongfulness of defendant Bishop's conduct in the fall of 1989, her claim is timely pursuant to the alternative "two years of discovery" limi-

tations period for that tort. *See* N.Y.Civ.Prac.L. & R. §§ 203(f), 213(8) (McKinney 1987). As the Court has already determined that the defendants are entitled to judgment as a matter of law on this count, we need not address this argument.

for the commencement of an action"). Believing it unwise and unjustified to do so, this Court declines to work a total revision of the state's policy in this area, and accordingly declines to invent a delayed discovery doctrine for this case.

*Equitable Estoppel*

 Plaintiff also urges that defendant Bishop be equitably estopped from pleading the statute of limitations. *See* N.Y.Gen.Oblig.L. 17–103(4)(b) (McKinney 1989 & Supp.1991). New York law provides that "a defendant may be estopped from pleading the statute of limitations where plaintiff was induced by fraud, misrepresentations or deception from filing a timely action." *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49, 377 N.E.2d 713, 716, 406 N.Y.S.2d 259, 262 (1978). Plaintiff alleges that she relied to her detriment on defendant Bishop's misrepresentation that his behavior was appropriate, and was therefore "unable to appreciate the improper, exploitative and harmful nature of her relationship with defendant Bishop...." Complaint at ¶ 16.

Just such an argument, however, was recently rejected by Justice Baer in *Bassile, supra:*

"... what really stopped plaintiff from suit in this case was his alleged failure to comprehend the reality and meaning of what had happened. Plaintiff, in other words, was affected by the enduring consequences of the alleged abuse.... this is better viewed as a basis for the invocation of a discovery rule rather than equitable estoppel or fraudulent concealment."

*Id. See also Gallas v. Greek Orthodox Archdiocese of North and South America,* N.Y.L.J. July 19, 1991 at 21 (Sup.Ct.N.Y.County) (rejecting plaintiff's equitable estoppel claim in child sexual abuse case); *Smith v. Smith,* 830 F.2d 11, 13 (2d Cir.1987) (doctrine applies only "when some conduct by a defendant after his initial wrongdoing has prevented the plaintiff from discovering or suing upon the initial wrong").

Plaintiff relies on *Coopersmith v. Gold,* 172 A.D.2d 982, 568 N.Y.S.2d 250 (3d Dep't 1991). In that case, the plaintiff patient brought an action for fraud, malpractice and battery against her former psychiatrist, alleging that the psychiatrist had abused the physician/patient relationship by having sexual relations with her. 568 N.Y.S.2d at 251. The court found that though the plaintiff's action would ordinarily have been time-barred, the plaintiff had raised fact issues regarding her defense of equitable estoppel which precluded summary judgment on the malpractice claim. In particular, the court recognized that abuse of the "transference" phenomenon—whereby a patient transfers feelings about matters and persons being discussed to the counselor—could justify an estoppel. *Id.*

*Coopersmith,* though, is distinguishable from the instant case, in that it involved *medical* malpractice, a recognized cause of action to which the doctrine of equitable estoppel has been applied. Furthermore, the plaintiff in that case brought suit six years after the commencement of treatment and six months from the termination of the parties' relationship; the comparable time periods in this case are thirty-one years and two years.

In a related aspect of her estoppel claim, plaintiff argues that defendant Bishop should also be estopped due to his fraudulent concealment of the nature of his acts. Once again, however, the cases establish that there must be some active concealment which is distinct from the initial wrong, an element lacking in this case. *E.g., Rizk v. Cohen,* 73 N.Y.2d 98, 535 N.E.2d 282, 538 N.Y.S.2d 229, 233 (1989) (fraudulent concealment claim fails when "plaintiff relies on the same act which forms the basis of his negligence claim"). Accordingly, defendant Bishop is not estopped from pleading the statute of limitations.

*Duress*

 Lastly, plaintiff contends that the statute is tolled because she was under duress. Plaintiff's Memorandum at 16–19. *See also* Miller Affidavit at ¶ 7 (explaining coercion inherent in sexual abuse). For this doctrine to apply, duress must be "an element of the cause of action asserted",

*Cullen v. Margiotta,* 811 F.2d 698, 722 (2d Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

This requirement has been applied strictly; courts confronted by facts which might suggest to the layman that "duress" is present have routinely refused to apply the doctrine. *See, e.g., Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803 (2d Dep't 1983) (death threat does not toll statute); *Stadtman v. Cambere,* 73 A.D.2d 501, 422 N.Y.S.2d 102 (1st Dep't 1979) (threat of discharge does not toll statute). *But see Cullen, supra,* 811 F.2d at 722–24 (duress toll potentially available since plaintiffs' underlying claim was extortion). Indeed, the cases are replete with statements like that in *Baratta, supra,* to the effect that "[t]he statute begins to run irrespective of ... whether [the party seeking to avoid it] has enough of courage and independence to resist a hostile influence and assert his rights or not." *Baratta,* 94 A.D.2d at 459, 464 N.Y.S.2d at 807 (quoting *Piper v. Hoard,* 107 N.Y. 67, 71, 13 N.E. 632 (1887)).

Furthermore, similar claims of duress extending the statute of limitations were recently rejected in three New York Supreme Court cases in which a victim of child sex abuse brought untimely actions against the alleged perpetrator. *See Bassile, supra; Gallas, supra,* at col. 5; *Burpee v. Burpee,* —— Misc.2d ——, 578 N.Y.S.2d 359 (Sup.Ct.Nassau County). In light of these authorities, it appears that duress is not an element of Ms. Schmidt's claim. Even if it were, it is extremely doubtful whether any reasonable juror could find that Ms. Schmidt was under constant legal duress for a thirty-one year period, during most of which she lived half a continent away from the defendant Bishop. Thus, the doctrine of tolling by duress will not prevent summary judgment in this case.

For all the foregoing reasons, summary judgment is granted defendant Bishop.

### The Church Defendants

Plaintiff has also named the Rye Presbyterian Church, the Presbytery of the Hudson River and the Presbyterian Church USA as defendants (the "Church Defendants"), on theories of *respondeat superior* (Count V), negligent placement, retention and supervision (Count VI) and negligence (Count VII).

These parties also seek summary judgment in their favor on various theories. To the extent that their liability is essentially vicarious, dismissal in favor of Bishop must of necessity end the case as to the Church Defendants. As summary judgment is being granted defendant Bishop, the Church Defendants are entitled to judgment as a matter of law on the *respondeat superior* claim. N.Y.Jur.2d Employment Relations § 337 at 447 (1986). *See also Turcotte v. Fell,* 68 N.Y.2d 432, 442, 502 N.E.2d 964, 970, 510 N.Y.S.2d 49, 55 (1986) ("... the dismissal of the complaint against Fell, [the defendant's] employee, mandates dismissal of the complaint against the employer") (citations omitted).

The affidavits submitted on behalf of these defendants—and Plaintiff's complaint itself—all confirm that defendant Bishop resigned as pastor of the Rye Presbyterian Church in the summer of 1982, and subsequently left both the Presbytery of the Hudson River (March 1983) and withdrew from the Presbyterian Church itself in 1984 when he joined another denomination, again as a clergyman.

However, in an affidavit submitted after argument on the motion, plaintiff shows that defendant Bishop continued to serve the Rye Church as "pastor emeritus", receiving the proceeds of a trust fund established by the Church's parishioners. Hawkins Affidavit at ¶¶ 4–6. In support of this allegation, they append to their affidavit a copy of a Rye Church Bulletin which they received in March 1991, in which defendant Bishop is listed among the officials as "pastor emeritus".

The Court regards this as a mere honorific. As a matter of law, these Church Defendants cannot be regarded as in fact supervising, or retaining, after 1984, a clergyman who in that year came under the discipline of a different and competing denomination. There being no such supervision after 1984, any claims based on negli-

**332**

gent hiring, supervision or retention of Bishop are of necessity time-barred.

 Furthermore, any inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement discussed above, which might involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs. Insofar as concerns retention or supervision, the pastor of a Presbyterian Church is not analogous to a common law employee. He may not demit his charge nor be removed by the session, without the consent of the presbytery, functioning essentially as an ecclesiastical court. The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millenia. As the Supreme Court stated long before the *Lemon* formulation was developed:

> It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

*Watson v. Jones,* 13 Wall. 679, 729, 20 L.Ed. 666 (1871). *See also St. Nicholas Cathedral of Russian Orthodox Church of North America v. Kedroff,* 302 N.Y. 1, 13, 96 N.E.2d 56 (1950) *rev'd on other grounds,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). It would therefore also be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant Bishop. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause. U.S. Const. amend. I.

Accordingly, summary judgment is granted the Church Defendants as well.

The Clerk of the Court shall enter final judgment for the defendants.

SO ORDERED.