PER CURIAM.
The .remaining defendants below, Farm? ers Insurance Exchange; Fire Insurance Exchange; Truck Insurance Exchange; Mid-Century Insurance Company; Farmers New World Life Insurance Company; Farmers Group, Inc.; Farmers Financial Solutions, LLC; Bristol West Insurance Company; Foremost Insurance Company Grand Rapids, Michigan; Foremost Property & Casualty Insurance Company; and Foremost Signature Insurance Company (all legally distinct insurance entities hereinafter- collectively referred to as “Farmers”) [1] appeal from a judgment in favor of the plaintiff,. Robert Kyle Morris.
*974 Facts and Procedural History
-In 2006, Morris, a licensed insurance agent, was working for his father’s-independent insurance agency, the Morris Insurance Agency (“Morris Insurance”). At some point, Morris contacted one of 'the Farmers entities about becoming a Farmers agent. Morris first met with Heather Lowry,[2] an employee of Michael A. Dewey Insurance Agency, Inc., which served as the district office for Farmers in Mobile and Baldwin Counties. Lowry testified that she showed Morris a presentation as an introduction to the opportunity to become a Farmers ageht. She also testified that Morris told her that he worked for his father’s insurance agency, and she admitted that she told Morris that being familiar with the insurance industry as a whole could possibly benefit him if he became a Farmers agent. Additionally, Lowry testified that, when she met with Morris, she was not aware that Farmers had a written policy that made Morris’s relationship with his father’s insurance agency unacceptable; that she did not have any documents available to her that would have made her aware that the relationship was unacceptable; that nothing in her training would have made her aware that a potential conflict of interest existed;1 and that the state office for Farmers did not ever tell her that she should not recruit Morris or that Morris was not a suitable candidate based on his relationship with his father’s agency.
Lowry further testified that, after that initial meeting with Morris, she gave Morris’s information to Michael Dewey, the district manager for Farmers, and to Steven Hunt, who was another of Dewey’s empjoyees. She testified that, in her discussion with Dewey, she would have mentioned the fact that Morris worked with his father’s independent agency. Finally, she testified that, from that point, Dewey and Hunj; took over Morris’s recruiting.'
Hunt testified that he worked in Fárm-ers’ district office and that he coached, managed; and helped train agents. He testified that, after Lowry met with Morris, Dewey wanted 'to meet with Morris and go over the reserve-agent package.[3] Hunt testified that it' was' his understanding that Dewey said that it was okay to continue to recruit Morris;
Dewey testified that Hunt and Lowry both asked him if Morris’s relationship with his father’s agency was acceptable. He also testified that he talked to someone at the state office for Farmers; that he f made the Farmers’ state office aware of the proposed situation regarding Morris’s relationship with his father’s agency; and that the representative at Farmers’ .state office told him that the arrangement was acceptable, Dewey testified that he then told Hunt and Lowry that the arrangement was acceptable and that Hunt and Lowry then followed up with recruiting Morris to become a Farmers agent. Low-ry, Hunt, and Dewey all testified that, at that time, they did not know that Morris’s association with his father’s agency constituted a conflict of interest and they did not know that Farmers had a written policy that provided that Morris’s association with his father’s agency after Morris'be *975 came a Farmers agent constituted a conflict of interest.
Morris testified that he initially became interested in working as a Farmers agent because Farmers had a policy whereby a Farmers agent could place insurance with a different company if a customer was not eligible for insurance issued by Farmers or if Farmers refused to underwrite a policy for the customer. He further testified that he had not been looking to disaffiliate himself from his father’s insurance agency and that he had told Lowry that he' did not want to cut off the working relationship he had with his father. During direct examination of Morris, the following occurred:
“[PLAINTIFF’S COUNSEL:] Did you specifically ask Farmers on multiple occasions before agreeing to become a Farmers agent if your association and continuing association with the Morris Insurance Agency was a problem in any way for Farmers?
“[MORRIS:] I asked them multiple times and always got the same answer.
“[PLAINTIFF’S COUNSEL:] And what was that answer?
“[MORRIS:] The answer was [it] is in no way a problem and is actually a benefit to you. That is the way I believed it to be.
“[PLAINTIFF’S COUNSEL:] A1 right. Did you rely on the representations made to you by Farmers ... before agreeing to become a ^Farmers agent?
“[MORRIS:] I relied on what they told me.
“[PLAINTIFF’S COUNSEL:] Would you under any circumstances have agreed to become a Farmers agent if Farmers would have told you the association with your father and the Morris Insurance Agency was a problem?
“[MORRIS:] Absolutely not.”
Morris . also testified that, • when- he agreed to become a Farmers - agent, he signed several different agreements; that nothing in any of those agreements or documents indicated that his relationship with his father’s agency constituted a conflict of interest; that the documents given to him did not say anything contrary to what he had been told by Dewey, Hunt, and Lowry; and that there was nothing in the agreements that made him think that the representations made to him by the agents of Farmers were false.
Morris submitted a “Reserve Agent Program Application,” which was approved by Farmers’ state office. That application showed that Morris was then working for his father’s insurance agency. On January 15, 2007, Morris executed a “Reserve Agent Appointment Agreement” (“the reserve-agent agreement”) and a “Horizontal Marketing Agent Relationship Agreement” (“the horizontal-marketing agreement”), both of which 'became effective on February 8, 2007. The reserve-agent agreement-provided that it “may be terminated by either the Reserve Agent or the Companies on ninety (90) days written' notice.” After successfully completing ‘the reserve-agent requirements, Morris became an agent with Farmers.
On May 22, 2007, Morris executed the ‘Agent Appointment Agreement” (“the agent agreement”), which was effective August 1, 2007. The agent agreement provided that it “may be terminated by either [Morris] or [Farmers] on three (3) months’ written notice.” At this time, Morris maintained an office at his father’s insurance agency. Evidence was introduced indicating that.Hunt had talked to Morris about the need for getting his own separate office. However, Hunt testified that he told Morris that Morris needed a separate office so he could put a Farmers sign out front and .so that Morris and *976 Farmers would have a presence in the community. He did not tell Morris that he needed to get a separate office because maintaining an office at his father’s agency constituted a conflict of interest.
Edward Stansel is the division marketing manager for Farmers Insurance Inc.[4] He testified that, based on various documents, which were introduced at trial, Farmers was aware of Morris’s association with his father’s insurance agency. On August 7, 2009, Stansel sent a memorandum to Keith Gockel, a senior marketing consultant for Farmers, requesting that the agent agreement be terminated and setting forth various issues he had with Morris. In the memorandum, Stansel pointed out that Morris’s father owned an independent insurance agency in Mobile and stated that he had proof that Morris had placed insurance that was eligible to be written through Farmers with his father’s agency. That allegation arose.out.of .a situation where a customer of another Farmers agent canceled a Farmers policy and then obtained insurance through Morris’s father’s agency. The other Farmers agent complained to Farmers about the situation. Stansel admitted in his video deposition that was played at trial that he did not have any documentation to prove that Morris had caused the customer to cancel his Farmers policy and to place insurance with Morris’s father’s agency. Additionally, Stansel indicated that he had not interviewed anyone regarding the situation. Rather, Stansel testified that he believed that Morris had placed insurance that was eligible to be written through Farmers with his father’s agency. There was also an allegation that Morris’s telephone number appeared on a sign for Morris’s father’s insurance agency.
Additionally, Stansel testified that, in the memorandum he had sent to Gockel in which he recommended the termination of Morris’s employment with Farmers, he had indicated that Farmers had had multiple issues with Morris in which agent counseling had taken place. Those issues included three instances in which Morris had not met minimum production standards; several instances when Morris had not appropriately applied cash he had collected to policies he had written; issues with Morris transfemng policies from other agents without going through the proper procedure; an instance in which. Morris provided a quote for insurance to a prospect of another Farmers agent; and an instance in which Morris had also written a policy that included wind coverage even though such coverage was against Farmers’ underwriting guidelines. Stansel’s memorandum also mentioned an incident in which Morris had written a policy for an entity known as “Private Collections.” Stansel indicated that Morris had represented that Private Collections was a gift shop and that Farmers’ commercial-underwriting division had approved the risk. However, the underwriting division later determined that Private Collections was actually a jewelry store, and the policy Morris had written was then set up for nonrenewal.
Stansel also described another incident in which Morris had written a policy on a house in which the square footage was listed as 200 square feet less than the square footage shown on the Baldwin County Revenue Department Web site and the house was listed as one year newer than the year listed on the Baldwin County Revenue Department Web site. Stansel testified that Morris was wrong in that situation; that that was a serious offense; *977 that writing a policy for the house without the proper square footage and without the proper year of construction was a material misrepresentation; and that that was actually cause for an agent’s immediate termination.
Further,' in his memorandum, Stansel stated:
“It is my recommendation, [after listing the exhibits], that we terminate the appointment of Kyle Morris based on the fact that business was stolen from another agent and placed with Morris Agency.”
Subsequently, Gockel approved the termination of the agent agreement. Gockel testified that Morris’s employment with Farmers was terminated pursuant to the three-month-notice provision of the agent agreement. He further testified that Morris’s employment was terminated for a number of reasons and that conflict of interest was one of those reasons. Additionally, internal documents from Farmers presented as evidence at trial showed that Morris’s employment was terminated based on a conflict of interest. , However, there was testimony indicating that conflict of interest was given as a reason because only one ground for termination could be entered into the computer system.
In September 2009, Stansel and Dewey went to Morris’s office and gave him written notice that the agent agreement would be terminated effective December 16, 2009. Morris testified that, when he asked why his employment with Farmers was being terminated, they told him that there was a conflict of interest because his father was in the insurance business. Morris subsequently sued Farmers, arguing that Farmers had fraudulently induced him to become a Farmers agent.[5]
The trial took place February 4-8, 2018. Farmers filed a motion for a judgment as a matter of law at the closé of Morris’s evidence and again at the close of all the evidence. On February 8, 2013, the jury returned a verdict in favor of Morris. The jury awarded Morris $600,000 in compensatory damages and $1,800,000 in punitive damages. On that same day, the trial court entered a judgment on the jury’s verdict.'
On March 8, 2013, Farmers filed a “Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for New Trial or for a Remittitur in the Verdicts”; that motion was denied by operation of law. This appeal followed.
Standard of Review
“ ‘ “The standard of review applicable to a motion for directed verdict or judgment notwithstanding the verdict [now referred to as a preverdict and a postverdict motion for a judgment as a matter of law] is identical to the standard used by the trial court in granting or denying the motions initially. Thus, when reviewing the trial court’s ruling on either motion, we determine whether there was sufficient evidence to produce a conflict warranting jury consideration. And, like the trial court, we must view any evidence most favorably to the non-movant.” ’ Glenlakes Realty Co. v. Norwood, 721 So.2d 174, 177 (Ala.1998) (quoting Bussey v. John Deere Co., 531 So.2d 860, 863 (Ala.1988)).”
Parker v. Williams, 977 So.2d 476, 480 (Ala.2007).
“ ‘The standard of review applicable to whether an expert should be permit *978 ted to testify is- well settled. The matter is “largely discretionary with the trial court, and that court’s judgment will not be disturbed absent an abuse of discretion.” Hannah v. Gregg, Bland & Berry, Inc., 840 So.2d 839, 850 (Ala.2002). We now refer to that standard .as a trial court’s “exceeding its discretion.” . See, e.g., Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc., 901 So.2d 84, 106 (Ala.2004) (“Our review of the record supports the conclusion that the trial court did not exceed its discretion in finding that Jones was properly qualified as an expert under Rule 702[, Ala. R. Evid.,] and in considering his testimony.”). However, the standard itself has not changed.’
“Kyser v. Harrison, 908 So.2d 914, 918 (Ala.2005).”
Robinson v. Baptist Health Sys., Inc., 24 So.3d 1119, 1125 (Ala.Civ.App.2009).
Discussion
Farmers’ arguments on appeal can be divided into two categories: (1) liability on the fraud claim itself and (2) damages. As to the issue of liability, Farmers’ arguments on appeal concern the element of reliance. The issue presented is whether the trial court should have determined, as a matter of law, that. Morris. could not reasonably have relied on the oral representation made to him that sharing an office with his father did not create, a problem and whether, therefore, the issue should have been submitted to the jury. The damages issue concerns the proper measure of damages if, in fact, the fraud claim—including the issue of reasonable reliance—was properly submitted to the jury-. .
I.
Farmers argues that the judgment in favor of Morris must be reversed, as a matter of law, because, it says, Morris eould not have, reasonably relied on the representation that his association with his father’s insurance agency would not constitute a conflict of interest.
“ ‘Fraud in the inducement consists of one party’s misrepresenting .a material fact concerning the subject matter of the underlying, transaction and the other party’s relying on the misrepresentation to his, her,, or its detriment in executing a document or taking a course of action.’
“Oakwood Mobile Homes, Inc. v. Barger, 773 So.2d 454, 459 (Ala.2000).”
Johnson Mobile Homes of Alabama, Inc. v. Hathcock, 855 So.2d 1064, 1067 (Ala.2003) (emphasis omitted).
“The elements of actionable fraud' based upon misrepresentations are: 1) a duty to speak the truth; 2) a false representation of a material existing fact made intentionally,' recklessly, or innocently; 3) action upon the false representation by the plaintiff; and 4) loss, harm, or damage 'proximately resulting from the false representation.”
Kidder v. AmSouth Bank, N.A., 639 So.2d 1361, 1362 (Ala.1994).
“This Court has stated that ‘fraudulent-inducement claim[s] [are] governed by the “reasonable-reliance” standard. Under that standard, a person cannot blindly rely on an agent’s oral representations to the exclusion of written disclosures in a contract.’ Harold Allen’s Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777, 783-84 (Ala.2000) (citations omitted).”
Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Alabama, 991 So.2d 701, 706 (Ala.2008) (emphasis added).
The “reasonable-reliance” standard , for fraudulent-inducement claims repeated in *979 Wright Therapy Equipment was declared by this Court in Foremost Insurance Co. v. Parham, 693 So.2d 409, 421 (Ala.1997). The Foremost Court rejected the “justifiable-reliance” standard this Court had adopted in Hickox v. Stover, 551 So.2d 259 (Ala.1989), and reiterated in Hicks v. Globe Life & Accident Insurance Co., 584 So.2d 458 (Ala. 1991), The problem with those earlier decisions was that they “per-mittted] a fraud case to go to the jury in all circumstances where all the plaintiff had to say was that he did not, in fact, know what the contract said.” Potter v. First Real Estate Co., 844 So.2d 540, 549 (Ala.2002). The Foremost Court, itself explained the effect of its rejection of this approach and its return to the “reasonable-reliance” standard:
“The concerns that have been expressed by at least four present members of this "Court as to the impact the Hickox standard has’ had on the law of fraud were best expressed by Justice Almon in his dissent in Hicks:
“ ‘The traditional standard of “reasonable reliance” provided a flexible concept adaptable to the circumstances of each case, including the relative sophistication and bargaining powers of the parties. The new standard of -“justifiable-reliance” gives to parties claiming fraud undue leeway to ignoré written contract terms and allows in some cases the automatic creation of a jury issue by a plaintiffs statement in contradiction of such written terms.’
“[Hicks v. Globe Life & Accident Ins. Co.,] 584 So.2d [458,] 469-70 [ (Ala.1991) ].
"After careful consideration, we conclude that the ‘justifiable reliance’ standard adopted in Hickox, which eliminated the general duty on the part of a person to read the documents received in connection with a particular transaction (consumer or commercial), should •be replaced with the ‘reasonable reliance’ standard most closely associated with Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983). The ‘reasonable reliance’ standard is, in our view, a more practicable standard. that will allow the factfinder greater flexibility in .determining the issue of reliance based on all of the circumstances surrounding a transaction, including the me,ntal capacity, educational background, relative sophistication, and bargaining power of the parties. In addition, a return to the ‘reasonable reliance’ standard will once again provide a mechanism, which was available before Hickox, whereby the trial court can enter a judgment as a matter of law in a fraud ..case where the undisputed evidence.indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.”
693 So.2d at 421 (emphasis added).
Farmers essentially argues that three aspects of Morris’s relationship with Farmers negate Morris’s fraud claim. The first two concern provisions of Morris’s written contracts with Farmers;. the third concerns information made available to . Morris outside those contracts. Consequently, Farniers’ first two arguments potentially implicate the Foremost reliance standard; the .third argument does not.
A.
Initially; Farmers contends that Morris could not have reasonably relied on the representations that sharing an office with his father would not constitute a conflict of interest because the reserve-agent agreement and the agent agreement provided that they were terminable at will by either *980 party with three months’ written notice. However, Morris asserts that “a person fraudulently induced to leave employment may sue for fraud in the inducement even if the new employment is at will.”
The gravamen of Morris’s claim is that Farmers made representations that induced him to leave his existing, exclusive employment arrangement with his father’s insurance agency. In Kidder v. AmSouth Bank, N.A., 639 So.2d 1361, 1363 (Ala.1994), a case involving similar fraud and employment-at-will issues, the plaintiff, Vicki Kidder, sued AmSouth Bank, N.A., alleging fraudulent inducement and breach of contract; the case was removed to a federal district court. The federal district court subsequently certified two questions to this Court regarding Kidder’s fraud-in-the-inducement claim. The first question was:
“ ‘Can Ms. Kidder, who was employed as an at-will employee subject to discharge by AmSouth at any time, maintain a cause of action based on fraud in the inducement of her employment based upon alleged misrepresentations • as to her working conditions?’ ”
639 So.2d at 1361-62. In addressing that question, this Court stated:
“It is well settled by our case law that ‘the showing of a loss of employment is legally inadequate to show the element of damage in a fraud claim by an at-will employee against his or her employer.’ See, Burrell v. Carraway Methodist Hospitals of Alabama, Inc., 607 So.2d 193, 196 (Ala.1992); Salter [v. Alfa Ins. Co., 561 So.2d 1050 (Ala.1990) ]. For example, in Salter, the plaintiff alleged that her employer represented that she did not have to be involved in investigating a particular insurance claim. The plaintiff alleged that she was then fired for failing to investigate the claim and that her termination caused her financial damage. The Court held that she suffered no legally recognized loss or damage as the result of any representation made by her employer because her contract was terminable by her employer at any time and for any, or for no reason.
“In Burrell the plaintiff alleged that his employer fraudulently misrepresented to him that certain conduct was permissible and that he was nevertheless discharged for participating in that eon-duct. This Court held that, even if the plaintiff proved those allegations, he had suffered no legally recognized damage because he was subject to termination at any time. 607 So.2d at 196.”
639 So.2d at 1362.
In contrast to Burrell v. Carraway Methodist Hospitals of Alabama, Inc., 607 So.2d 193 (Ala.1992), the gravamen of the claim in Kidder was that the allegedly fraudulent representation had induced the employee to leave her former job. This Court addressed Kidder’s claim as follows:
“In a similar case, this Court held that an employee could sue for a fraudulent misrepresentation that occurred before her employment. [In] Smith v. Reynolds Metals Co., 497 So.2d 93 (Ala.1986), the plaintiff contended that the employer misrepresented .to her-that she was qualified for summer employment. The Court allowed the plaintiff to proceed on her claim that she had relied upon this misrepresentation and that, in her reliance, she had turned down other employment and educational opportunities.
“AmSouth argues that Bates v. Jim Walter Resources, Inc., 418 So.2d 903 (Ala.1982), applies to this case and bars Kidder’s fraud claim. The plaintiff in Bates accepted a job offer by the defendant and quit her former job as a dental hygienist. Before she began her new job, the defendant had a hiring freeze and terminated the plaintiffs employ *981 ment. The plaintiff sued, alleging breach of contract and claiming damages for the loss incurred by giving up her former job. The termination of the Bates plaintiff, an at will employee, occurred before her actual employment had begun; this Court held that the doctrine of at will employment barred her claim.
“However, there is a difference between Bates and this case. The Bates plaintiff alleged a breach of contract claim against the employer. Kidder claims that she was fraudulently induced to accept AmSouth’s job offer. The breach of contract alleged in Bates did not arise until some time after the plaintiff had accepted the defendant employer’s offer. In this present case, however, the elements of fraud were met when Kidder gave up her former employment, having agreed to work for AmSouth based on its alleged misrepresentations. Notably, in Smith v. Reynolds Metals Co., this Court held that the plaintiff, as an employee at will, had no breach of contract claim even though she was allowed to pursue a fraud claim.
“We hold that Kidder may maintain an action alleging fraud in the inducement of her employment based upon alleged misrepresentations as to her working conditions.”
639 So.2d at 1362-63.
In this case, Morris has not sued Farmers alleging a' breach of contract as to his relationship with Farmers. Rather, Morris has sued alleging that, among other things, Farmers fraudulently induced him to alter his prior business relationship with his father’s insurance agency and to instead begin placing insurance policies with Farmers. Morris argues that he' was harmed because .he lost the opportunity to sell policies and accumulate a “book of business” through his father’s insurance agency rather than through Farmers. Just as in Kidder, Morris’s status as an at-will employee for Farmers does not change the fact, as found by the jury, that Morris was fraudulently induced to leave his former employment. Morris’s claim is focused on that occurrence, not on whether his eventual termination by Farmers constituted a breach of the contract between him and Farmers.
 Farmers’ attempt to avoid liability by relying upon the at-will nature of Morris’s employment contracts finds no logical boundary at contracts lacking express at-will clauses. Even in the absence of such a clause, Alabama law provides that contracts for an indefinite period generally are terminable at will (see, e.g., Webb Wheel Prods., Inc. v. Hanvey, 922 So.2d 865, 870 (Ala.2005)) and that parties to a contract are charged with knowledge of the law governing their contract (Burrell v. Carraway, 607 So.2d 193 (Ala.1992); Salter v. Alfa Ins. Co., 561 So.2d 1050 (Ala.1990)). As a result, embracing Farmers’ position would require not only an overruling of Kidder and the cases it relies upon, it logically would mean that the at-will nature of Alabama employment contracts generally would eliminate from our jurisprudence any claims alleging fraud of the'nature alleged here.
There is no difference between this case and Kidder in regard to the fact that the actions of the defendant necessary to support a cause of action based on fraud were completed before the new employment began.[6] And in'both cases the plaintiff “ ‘seeks damages only with respect to *982 what [he] gave up in taking the [new] job.’” 639 So.2d at 1362 (quoting trial court’s second certified question in Kidder). The holding in Kidder, which has not been overruled, applies here. When an employee leaves one job for another, based on a ’misrepresentation by the new employer regarding the new job that is not true at the time it is made, the new employer cannot hide behind the fact that Alabama law enforces or reads into the new employment contract an “at will” clause to avoid the consequences of its fraud.[7] Therefore, the fact that the agent agreement was terminable at will by either party would not, as a matter of law, prevent Morris from reasonably relying on the representations made to him.
B.
Farmers also argues that Morris could not have reasonably relied on the representations made by Lowry, Hunt, and Dewey because the horizontal-marketing agreement contained a “merger” or “integration” clause that provided, in pertinent part:
'“The Agreement contains the entire agreement between [Morris] and [Farmers] except for the aforementioned and applicable [reserve-agent agreement].... Each party to this Agreement acknowledges that no representations, inducements, promises or - agreements orally or otherwise have been made by or behalf of any party except those covenants and agreements expressly noted above, or embodied in this Agreement. As of the effective ’date of this Agreement, this Agreement fully supersedes any and all prior negotiations, agreements or understanding between the parties -pertaining to the ■subject matter of this Agreement and there are no oral or written agreements, - understandings representations or statements relating to the subject matter of this Agreement other than the afore *983 mentioned and applicable [reserve-agent agreement].”
However,
“this Court has never held that an integration clause ... renders a party’s reliance on oral representations unjustifiable, or unreasonable, as a matter of law. To the contrary, this Court has consistently held that although a written contract stipulates that there were no oral understandings not incorporated therein, such a stipulation does not foreclose a party, as a matter of law, from establishing his reliance on fraudulent representations that induced him to enter the contract. See Harris v. M & S Toyota, 575 So.2d 74 (Ala.1991); Stanard Tilton Milling Co. v. Mixon, 243 Ala. 309, 312, 9 So.2d 911, 913 (1942); Standard Oil Co. v. Myers, 232 Ala. 662, 665, 169 So. 312, 314 (1936); Alabama Machinery & Supply Co. v. Caffey, 213 Ala. 260, 262, 104 So. 509, 511 (1925); J.A. Fay & Egan Co. v. Independent Lumber Co., 178 Ala. 166, 168, 59 So. 470, 471 (1912); see also Advanced Studios of Alabama, Inc. v. Advanced Hairpiece, Inc., 607 F.2d 1138, 1139 (5th Cir.1979) (applying Alabama law). Accord, AgriStor Leasing v. Farrow, 826 F.2d 732, 736 n. 6 (8th Cir.1987) (applying Iowa law); V.S.H. Realty, Inc. v. Texaco, Inc., 757 F.2d 411, 418 (1st Cir.1985) (applying Massachusetts law); King v. Horizon Corp., 701 F.2d 1313, 1318 (10th Cir.1983) (applying Colorado law); Arnold v. National Aniline & Chemical Co., 20 F.2d 364, 369-70 (2d Cir.1927) (applying New York law); RepublicBank Dallas v. First Wisconsin National Bank, 636 F.Supp. 1470, 1473 (E.D.Wis.1986) (applying Wisconsin law); Hall v. Crow, 240 Iowa 81, 34 N.W.2d 195, 199 (1948); Bates v. Southgate, 308 Mass. 170, 31 N.E.2d 551, 557-58 (1941); Burns v. Vesto Co., 295 S.W.2d 576, 579 (Mo.App.1956); Hector M. v. Commissioner of Social Services, 102 Misc.2d 676, 425 N.Y.S.2d 199, 205 (N.Y.Fam.Ct.1980); Angerosa v. White Co., 248 A.D. 425, 290 N.Y.S. 204, 213 (1936); McInnis & Co. v. Western Tractor & Equip. Co., 63 Wash.2d 652, 388 P.2d 562, 565 (1964); Coson v. Roehl, 63 Wash.2d 384, 387 P.2d 541, 544 (1963); Anderson v. Tri-State Home Improvement Co., 268 Wis. 455, 459-60, 67 N.W.2d 853 (1955). This holding ensues from the, rule that when an agreement has been induced by deliberate fraud, the written document .reciting that agreement is void and is ‘of no more binding efficacy ... than if it. had no existence, or were a piece of waste paper.’ Drinkard v. Embalmers Supply Co., 244 Ala. 619, 621, 14 So.2d 585, 587 (1943); accord, Angerosa, 248 A.D. at -, 290 N.Y.S. at 213; Coson, 63 Wash.2d at 387, 387 P.2d at 544.
“The policy behind permitting a party to establish his reliance oh another’s fraudulent inducements despite an integration clause in the written agreement has been well stated by the Massachusetts Supreme Court:
“‘In the realm of fact it is entirely possible for. a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false .but for which he would not have made the agreement. To deny this possibility is to' ignore the frequent instances in everyday experience where parties accept, often without critical ¿xamination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form' or another, but where they do so, nevertheless, in reliance upon the honesty of supposed friends, the plausible and disarming statements of *984 salesmen, or the customary course of business. To refuse relief would result in a multitude of frauds and in thwarting the general policy of' the law.’
“Bates, 308 Mass. at 182, 31 N.E.2d at 558, cited in V.S.H. Realty, Inc., 757 F.2d at 418; King, 701 F.2d at 1318. Thus, although a party who in fact relies upon fraudulent inducements in the face of an integration clause may be negligent in so doing, his negligence 'will not prohibit him as a matter of law from recovering for injuries intentionally inflicted upon him.
“ Before Hickox v. Stover, 551 So.2d 259 (Ala.1989), ‘reasonable reliance’ was the standard in fraud actions.”[8]
Downs v. Wallace, 622 So.2d 337, 341-42 (Ala.1993). Therefore, the presence of the merger/integration clause in the horizontal-marketing agreement would not, as a matter of law, preclude Morris from reasonably relying on the representations made to him.
C.
Finally, Farmers argues that Morris could not have reasonably relied on the representations made to him by Lowry, Hunt, and Dewey because, it says, the training materials Morris was supposed to have reviewed before becoming a full-time agent would have put him on notice that his continued association with his father’s insurance agency constituted a conflict of interest. Specifically, Farmers argues that a statement in an online training manual—the “Farmers Code of Business Ethics and Professional Standards” (“the Farmers ethics manual”)—rendered null any representations made by Farmers representatives to Moms concerning whether he could continue his association with his father’s insurance agency after he became a Farmers agent.
It is true that “where an alleged misrepresentation is explicitly addressed and negated in a written agreement signed by the parties, any reliance on a contrary oral assertion may be deemed unreasonable as a matter of law.” 37 Am.Jur.2d Fraud and Deceit § 255 (2013)(emphasis added). Foremost put it this way:
“[A] return to the ‘reasonable reliance’ standard will once again provide a mechanism ... whereby the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms.”
693 So.2d at 421 (emphasis added). The Court reiterated the standard in Massey Automotive, Inc. v. Norris, 895 So.2d 215, 218 (Ala.2004):
“Under the reasonable-reliance standard, a judgment as a matter of law in favor of the defendant in a fraud case is appropriate where the party who claims fraud in the transaction was fully capable of reading and understanding the terms of the contract involved in the transaction, but instead blindly relied on the defendant’s oral representations to the exclusion of written disclosures in the contract to the contrary.”
(Emphasis added.)
Foremost refers to terms of a written contract that contradict oral representations; it does not address the question of under what circumstances reasonable reliance is precluded by statements in docu *985 ments other than the contract between the parties, such as an online training manual.[9] See also Alabama Elec. Coop., Inc. v. Bailey’s Constr. Co., 950 So.2d 280 (Ala.2006) (holding that representations in a noncon-tractual document could not be reasonably relied upon by a plaintiff precisely because only the written contract could be relied upon).
It was undisputed that the agent agreement did not include any provision regarding conflicts of interest. Even if it had contained some statement that should have provoked further inquiry by Morris regarding his association with his father’s insurance agency, Morris clearly and repeatedly made such inquiries regarding that association and repeatedly was told that Farmers had no policy against such an association.
The trial court framed the issue to the jury in this case consistently with the fact that the statement in the Farmers ethics manual regarding conflicts of interest was not part of the written contract between the parties. As Morris argues in his brief on appeal:
“There was nothing—zero—in the employment agreement that could or should have alerted [Morris] to investigate whether Farmers’ [representatives] really truly meant what they said when they repeatedly told him there was no problem with his continuing his affiliation with his father’s agency.... [Nothing in the documents that [Morris] signed to become an agent contradicted Farmers’ false statement that it had no policy making it a conflict of interest when a.Farmers agent ‘offices with an agent or broker of another insurance company.’
“... Farmers does not now contend-that anything in the documents [Morris] initially signed contradicted the misrepresentation that working with his father was not a' problem. Instead, Farmers on appeal argues only that one paragraph buried deep in online training materials provided to [Morris] months after the false representations were made to him, and after he agreed to become a Farmers agent, establish as a matter of law that he could not reasonably have relied on the misrepresentations made to him before he accepted employment.”
It also should be noted that one of the contracts in this case contains a merger clause. In essence, Farmers is contending that Morris could not have reasonably relied upon the representations made to him because of. a statement regarding conflicts of interest contained in a document that was not part of a contract that expressly stated that it was a complete expression of the r parties’. agreement. Perhaps it is a recognition of this contradiction that causes Farmers to stop short of arguing in its brief that the statement in the Farmers ethics manual constitutes an explicit contractual refutation of the oral representations, as would be required for Foremost to apply. In other words, Farmers does not argue that Foremost governs here. Instead, it contends that the statement in the Farmers ethics manual put Morris “on notice that he could not rely on the *986 claimed representation” and that “[h]e did not inquire about any contradiction.”
Again, this argument is not a “Foremost reasonable-reliance argument.” It is simply an.argument that a plaintiff could not reasonably rely on one extracontractual statement by an employer (or, in this case, several statements) in light of a separate, conflicting extracontractual statement by the same employer. More specifically, Farmers must persuade us that, as a matter of law, Morris could not reasonably have relied upon t.he particular, direct, repeated, assurances he received from representatives of Farmers in response to his pointed inquiries when there was a conflicting statement to. be found in the Farmers ethics manual that Morris was supposed to have read as part of his orientation. Given the pai'ticular facts of this case, we are not so persuaded. We cannot say that the trial court incorrectly concluded that the issue whether Morris could have reasonably relied upon the repeated oral representations made to him in direct response to his repeated inquiries, as opposed to the statement at issue in the Farmers ethics manual, was a factual question for the jury.
Morris argues as follows as to the facts that supported the submission of the issue to the jury and the jury’s verdict:
“First, Mr. Morris testified that he never saw the materials Farmers now points to. Second, Mr. Hunt and Ms. Lowry, who completed the same training as [Morris], both testified that they had never seen this provision. Mike Dewey testified that he did not know such a provision existed. Steve Hunt testified not only that he did not know about it but also that he had not found it when he had taken the very same training. Mr. Hunt could not even find it in the materials when asked to do so on the witness stand.
“The evidence thus established that it was unreasonable to expect anyone to find the particular training materials Farmers cites as precluding, as a matter of law, reasonable reliance. The jury was shown a demonstrative aid that was consistent with [Morris’s] testimony and Steve Hunt’s testimony about how hard it was to find the ‘conflict of interest’ provision.”
The demonstrative aid referenced described the following steps to which Morris had to go to even find the conflict-of-interest'statement in the Farmer's ethics manual:
“‘1. Take the “Constructing Your Business” online module, which is one of dozens of online courses.
“ ‘2. Go to page 19, under “Duties and Responsibilities,” and find the second •paragraph.
“‘3. Go to the company server and click on “Agency Dashboard,” “Managing,” “My Operations,” and “Agent Guide.”
“ ‘4. Find Section 3 of 10 in the “Agent Guide.”
“‘5. Find the 7th of 13 categories listed in the table of contents for that section alone.
“‘6. Go to that category, titled “Responsibility,” and find subsection 1, .
“‘7. Look at the third paragraph. There it says: “Accordingly, an agent who offices with an agent or broker of another insurance company, will be considered as maintaining a conflict of interest.” ’ ”
Morris’s argument continues: “Under the circumstances, whether [Morris] reasonably relied on Farmers’ misrepresentation was patently a jury question,”
We agree with Morris. See also Potter v. First Real Estate Co., 844 So.2d 540 (Ala.2002) (holding that the plaintiffs were *987 not barred by a difficult-to-read provision in a survey that contradicted the oral representations upon which they had relied regarding whether the house they had purchased was located in a flood • plain).
Morris entered into an employment relationship with Farmers only after receiving multiple assurances that his affiliation with his father’s insurance agency was not a problem. Likewise, Farmers accepted Morris’s services with full knowledge of Morris’s situation. Morris did not blindly rely on oral representations and ignore the terms of his contracts. The only information contrary to what Morris had been told was buried in a 200-page manual among dozens of other documents provided for training modules, and even longtime Farmers employees were not aware of the existence of the statement. Under these circumstances, a jury could find that it was reasonable for Morris to rely upon the representations made by- Farmers representatives and for him to be unaware of the single, noncontractual statement to- the contrary. Morris presented sufficient evidence of fraudulent inducement for the matter to be decided by the jury. Therefore, we cannot conclude that the trial court erred in denying Farmers’ post-judgment motion for a judgment as a matter of law.
II.
Having held that the judgment for Morris on the fraud claim is due to be affirmed, we consider Farmers’, arguments regarding the damages awards. Farmers argues that the jury’s compensatory-damages award was not supported by the evidence. Specifically, it contends that the calculation by Morris’s expert regarding Morris’s economic loss was based solely on what Morris would have earned had he continued as a Farmers agent and that Morris’s expert speculated as to the length of time Morris would have remained a Farmers agent, despite the fact that the agent agreement was terminable at will. Farmers is correct that Morris would not be entitled to damages based on a loss of income he would have received had the agent agreement not been terminated. However, Farmers has mischaracterized the evidence Morris presented regarding compensatory damages.
Morris was “entitled to damages for all injuries proximately caused by” Farmers’ misrepresentation. Kidder, 639 So.2d at 1363. At trial, Morris argued that the measure of damages would be the opportunities he had lost by becoming a Farmers agent. Specifically,' he asserted that, by becoming a Farmers agént, he lost the opportunity to write policies through his father’s insurance agency during the time the reserve-agent agreement and the agent agreement were in. effect.
Morris called as a witness Mark Palow-ski,[10] a certified public accountant who had been hired' by Farmers as a business-valuation expert. Palowski testified that Morris had incurred business expenses in becoming a Farmers agent. He also testified that, in his opinion, Morris’s customers were loyal to Morris, not Farmers; that those individuals purchased policies from Morris 'based on their relationship with Morris and not based on Morris’s relationship with Farmers; and that, if Morris had recommended other products from companies other than Farmérs, the customers would have bought those products. He further agreed that, if Morris had remained with his father’s insurance *988 agency, he would have been able to sell policies- to those same customers through his father’s insurance agency rather than through Farmers. He further testified that Morris gave up his ability to sell those policies out of his father’s agency when he agreed to become a Farmers agent. Palowski also testified that, in his opinion, the best evidence to determine what Morris would have sold if he had stayed at his father’s insurance agency was to look at what he sold with Farmers during that same period. He further testified that he believed that Morris would have had the same retention rate for policies at his father’s insurance agency as he had had at Farmers.
Morris’s father testified that insurance agents normally retain policies between 10 to 20 years. He also testified that he had personally retained policies for even longer periods.
Morris’s expert, Dr. Robert Herbert, used the commissions Morris had earned at Farmers and Morris’s retention rate at Farmers as a measure for determining the amount of commissions Morris could have earned if he had remained with his father’s insurance agency instead of going to work for Farmers. He also calculated the amount Morris could have expected to earn on such policies in the future and compiled a chart showing the commissions Morris could have earned on policies sold through his father’s agency if he" had retained those policies anywhere from 1 to 25 years. Thus, the evidence presented by Morris regarding his damages was based on commissions he could have earned if he had written policies through his father’s agency during the periods when the reserve-agent agreement and the agent agreement were in effect. Because the evidence Morris presented regarding his damages was not based on commissions he would have earned at Farmers if he had continued to work for Farmers, Farmers’ argument in this regard is without merit.
Farmers also contends that the evidence did not show that Morris actually lost income because Morris’s income increased after he went to work for Farmers and because the amount of income he earned from his father’s insurance agency after leaving Farmers’ employment was actually greater than the amount of income he had earned from his father’s insurance agency before he went to work' at Farmers. However, Morris presented evidence indicating that, if he had stayed at his father’s insurance agency, he could have sold policies in the same amount as the policies he sold while working at Farmers. He also presented evidence indicating that the projected net income on that amount of business would have been $76,310 in 2010 and $78,088 in 2011. However, it appears that Morris earned only $60,000, from his father’s insurance agency during 2010 and 2011. Therefore, Farmers’ argument in this regard is without merit. ■ • -
Farmers further contends that Morris’s claim for business expenses he had incurred by becoming a Farmers agent “should not have been a damage[s] component because they were more than offset by his Farmers commission income.” It also argues that Morris voluntarily undertook those expenses to become a Farmers agent. Farmers presented this argument in its postjudgment motion. However, it did not present this argument in either its oral or written motion for judgment as a matter of law at the close of all the evidence. Accordingly, it did not preserve this argument for appellate review. See Williford v. Emerton, 935 So.2d 1150, 1154 (Ala.2004) (holding that “ ‘ “[i]t is a procedural absolute that a [posttrial motion for a JML [judgment as a matter of law]], based on the ‘insufficiency of the *989 evidence,’ is improper, if the party has not moved for a [JML] on the same ground at the close of all the evidence.” Barnes v. Dale, 530 So.2d 770, 776 (Ala.1988)’ ”).
Additionally, in its brief to this Court, Farmers did not cite any authority in support of its argument that the judgment should not have included an amount for business-operating expenses because Morris had voluntarily expended the money it took to become a Farmers agent and because the income Morris had received from Farmers exceeded the expenses he had incurred. Therefore, Farmers’ argument in this regard does not comply with Rule 28(a)(10), Ala. R.App. P. See Van Voorst v. Federal Express Corp., 16 So.3d 86 (Ala.2008). Accordingly, we will not consider this argument.
III.
Finally, Farmers argues that this case should be remanded for a hearing regarding whether the $1,800,000 punitive-damages award was excessive. In its post-judgment motion, Farmers argued that the punitive-damages award was excessive and asked for a remittitur of that award. It also requested a hearing on its post-judgment motion. The trial court did not conduct a hearing on the motion. Additionally, Farmers’ postjudgment motion was denied by operation of law, and the trial court did not make any findings regarding Farmers’ request for a remittitur of the punitive-damages award. This Court addressed a similar argument in Target Media Partners-Operating Co. v. Specialty Marketing Corp., 177 So.3d 843, 869-70 (Ala.2013), as follows:
“Section 6-11-23(b), Ala.Code 1975, states:
“Tn all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon the motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages.’
“In their postjudgment motion, Target Media and Leader requested a Hammond[ v. City of Gadsden, 493 So.2d 1374 (Ala.1986) ]/Green Oil[ Co. v. Hornsby, 539 So.2d 218 (Ala.1989) ] hearing, but the trial court summarily denied their postjudgment motion without holding the requested hearing to consider Target Media and Leader’s argument that the punitive-damages awards were excessive.
“This Court has clearly held that a defendant is entitled to a Hammond/Green Oil hearing if the defendant requests such a hearing. In Southeast Environmental Infrastructure[, L.L.C. v. Rivers, 12 So.3d 32 (Ala.2008) ], this Court held: Tn its postjudgment motion for a remittitur, SEI timely requested a hearing on that motion. Therefore, SEI was entitled to such a hearing, and the trial court erred in not conducting a hearing on SEI’s remittitur motion, before it denied the motion. 12 So.3d at 50. In Lifestar Response of Alabama, Inc. v. Lemuel, 908 So.2d 207, 225 (Ala.2004), this Court held that Lifestar would have been entitled to a Hammond/Green Oil hearing if it had properly requested one. Here, the trial court did not hold the hearing Target Media and Leader requested in their post-judgment motion; instead, it denied that motion without explanation. When Specialty Marketing asked the trial court to enter an order explaining the reasons it had denied the postjudgment motion and Target Media and Leader again requested a Hammond/Green Oil hearing, the trial court responded by scheduling the requested hearing, but the scheduled date was outside the time in which Target Media and Leader were required to *990 appeal from the judgment. Moreover, as we held in .Section III.A. of this opinion, the trial court lost jurisdiction to hold such a hearing after it denied Target Media and Leader’s postjudgment motion.
“‘This Court and the Legislature have established a constitutionally appropriate system for reviewing a contention that a punitive-damages award is excessive. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989); and § 6-11-23(b), Ala.Code 1975. Additionally, the United' States Supreme Court has established various “guideposts” and considerations for assessing whether punitive damages are excessive, in a series of cases including, most notably, BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).'
“Lifestar Response, 908 So.2d at 225.
“In Williford v. Emerton, 935 So.2d 1150, 1156 (Ala.2004), this Court explained the reasoning behind the requirement of a Hammond/Green Oil hearing, as well as the requirement that the trial court enter an order containing its findings as a result of that hearing.
“ ‘[Without a written statement of the reasons for that denial [of a defendant’s postjudgment motion challenging an award of punitive damages,] the requirements of Hammond have not been satisfied. As we explained in Love v. Johnson, 775 So.2d 127, 127-28 (Ala.2000), such a written statement is necessary before this Court can conduct a proper review on appeal:
“ “In Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala.1986) ], this Court required that a trial court ‘reflect in the record the -reasons for interfering with a jury verdict, or refusing to do so, on- the grounds of excessiveness of the damages.’ 493 So.2d at 1379; see also ALFA Mut. Ins. Co. v. Brewton, 554 So.2d 953 (Ala.1989). In Hammond, this Court stated the reason for the requirement:
“ ‘ “ ‘[T]he trial judge is better positioned to decide whether the verdict is ... flawed [as excessive]. He has the advantage of observing all of the parties to the trial—plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There aré many facets of a trial that can never be captured’ in a record, so that the appellate courts are at a special disadvantage when they are called upon to review [a] trial [court’s] action in this sensitive area....’ .
“‘“493 So.2d at 1378-79.”
“‘When a trial court fails to put in writing its reasons for denying a motion to' review a punitive-damages award for excessiveness, this Court’s practice has been to remand the cause for the trial court to enter an order in compliance with Hammond. See, e.g., Love, 775 So.2d at 128; Spencer v. Lawson, 815 So.2d 502 (Ala.2001); Southern Pine Elec. Coop. v. Burch, 878 So.2d 1120 (Ala.2003). We therefore remand this -case to the trial court for the entry of an order that complies with' the requirements of Hammond. On return to remand, the Willifords will have the opportunity to renew their argument that the punitive-damages award is outside the constitutional parameters set forth in Gore and Hammond/Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), should they still wish to do so.’
*991 “935 So.2d at 1156.”
Accordingly, we remand this case'to the trial court for that court to conduct a Hammond/Green Oil[11] hearing regarding the jury’s punitive-damages award against Farmers. On return from that remand, Farmers can renew its argument that the punitive-damages award is excessive, if it chooses to do so. The trial court shall make a return to this Court within 90 days from the date this opinion is released.
Conclusion
Based on the foregoing, we affirm the denial of Farmers’ motion for a judgment as matter of law and/or for a new trial as to Morris’s fraudulent-inducement claim. We also affirm the denial of Farmers’ request for a remittitur of the compensatory-damages award. However, we , remand, this case for the trial court, to conduct a Hammond/Green Oil hearing on the punitive-damages award and to make a return to this Court within 90 days from the date this opinion is released.,
AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.*
PARKER, MURDOCK,-MAIN, and WISE, JJ., concur.
BRYAN, J., concurs in part and cdncurs in the result in part.
MOORE, C.J., and STUART, BOLIN, and SHAW, JJ., dissent.

. In the record, the parties often refer to “Farmers,” with no indication as to which entity they are referring or whether they are referring to all the entities.

. At the time of trial, Lowry had married and changed her name to "Heather Martin." However, we will refer to her as "Lowry.”

. Evidence was presented indicating that a reserve agent is an agent who is undergoing sales, marketing, and prospecting training with Farmers; that the resejye-agent .agreement is a 12-month agreement that allows the reserve agent to see if he or she would be suited for .a career as a Farmers agent; and that the reserve-agent agreement also gives Farmers an opportunity to evaluate the potential agent.

. Stansel testified that Farmers Insurance Inc. is a management company that manages the Farmers insurance exchanges and the employees who work for the exchanges.

. Morris also named Farmers Insurance Group, Hunt, Lowry, Dewey, and Michael A. Dewey Insurance Agency, Inc., as defendants. The claims against them were dismissed without prejudice.

. ■ Of course, until such time as the employee loses his or her new job, the fraud may not be manifest and the measure of the employee's injury as a result of having left his or her former job may not be fully and fairly discernible.

, The situation might be different if the extra-contractual assurance received by Morris was promissory as to the specific, issue of the longevity of Morris's employment, at -least where if could not be proven that the employer had no present intent to perform it.
"[Wjhen the employer hiring .fraud is- not promissory in nature and instead involves the misrepresentation of current or historical fact, there is no direct clash with the employment-at-will doctrine. As the cases demonstrate, allegations of employer fraud are extremely diverse and- include non-promissory allegations concerning the existence of a job, nature of the job duties, general terms and conditions of employment, financial 'strength and economic stability of’the firm, and other misleadihg assertions concerning the economic status.of the firm. In all of these widely diverse cases of nonpromissory fraud, the employer makes no promises concerning the future employment relationship during the prehire negotiations. The employer allegedly misrepresents current or past fact but makes no promise that relates to the longevity of future employment, In these types of cases, there is no resulting factual clash with the employment-at-will doctrine because that doctrine is forward looking and orders the future relationship between- the employer tjnd employee, not the behavior leading up to employment."
Richard P. Perna, Deceitful Employers: Intentional Misrepresentation in Hiring and the Employment-at-Will Doctrine, 54 U. Kan. L.Rev. 587, 630-33 (2006) (footnotes omitted and emphasis added). Compare Gardner v. State Farm Mut. Auto. Ins. Co., 822 So.2d 1201 (Ala.Civ.App.2001). In Gardner, a former sales agent for, State Farm alleged that at the time she executed an agreement to become a sales agent she was promised by a State Farm representative that her employment would be terminated in the future only if she cheated or misappropriated company funds. Her employment agreement, however, specifically stated that her employment was terminable at will. The Court of Civil Appeals concluded that, in this circumstance, Gardner could not have reasonably relied upon a promise of future employment when considered in light of what the contract itself specifically said about the same matter.

. As previously noted, however, in Foremost, supra, this Court rejected the justifiable-reliance standard set forth in Hickox and reinstated the reasonable-reliance standard.

. It is true that some of the universal-life-insurance cases decided by this Court, such as AmerUS Life Insurance Co. v. Smith, 5 So.3d 1200 (Ala.2008), and Baker v. Metropolitan Life Insurance Co., 907 So.2d 419 (Ala.2005), appear to have involved a mixture of contratual documents and noncontractual disclosures or schedules that contradicted the oral representations at issue. It does not appear, however, that the Court was directly presented in those cases with an argument that the noncontractual documents should not be considered on the reliance issue because those documents were not contractual in nature and were therefore not binding on the parties.

. Morris’s brief states that this witness’s name is correctly spelled "Pawlowski” and that it is incorrectly spelled in the transcript.

. Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).

 Note from the reporter of decisions; On December 16, 2016, on return to remand, the Alabama Supreme Court affirmed, without opinion. On February 24, 2017, that court denied rehearing, without opinion.